## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Toumazou, | ) | |
| et al., | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No. 09-1967 |
| | ) | Judge Paul L. Freidman |
| v. | ) | |
| | ) | |
| | ) | |
| | ) | |
| Turkish Republic of Northern Cyprus | ) | |
| et al. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| _____ | ) | |

### MOTION FOR LEAVE TO FILE AN OVERLENGTH MEMORANDUM IN SUPPORT OF THE TRNC'S MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT AND POINTS AND AUTHORITIES IN SUPPORT THEREOF

Pursuant to Local Rule 7(e), Defendant the Turkish Republic of Northern Cyprus ("TRNC") hereby moves this Court for an Order to allow Defendant TRNC leave to file a memorandum in support of its Motion to Dismiss Plaintiffs' Second Amended Complaint in excess of the applicable page limitation. The TRNC's seeks to file a memorandum that is 55 pages long, which is ten pages over the limit allowed by Local Rule 7(e), which allows a party to file a memorandum longer than 45 pages with prior approval by the Court.

Counsel for the TRNC sought the consent of counsel for Plaintiffs as required by Local Rule, Counsel for Plaintiffs refused consent to this Motion.

In support of this Motion, the TRNC states the following:

The TRNC requests leave to file an overlength memorandum so that the TRNC may include a Counterstatement of Facts of unusual length.  This document is necessary to adequately establish the complex historical background of the Cyprus dispute, which underlies Plaintiffs' claims.

Further, the TRNC's Counterstatement of Facts seeks to cool the heated political rhetoric and distortions of the Amended Complaint, which have viciously attacked the TRNC's honor and dignity.  But for the Counterstatement of Facts, TRNC's legal argumentation occupies roughly 31 pages, which is well under the 45 page limit.

The TRNC has attached the Motion to Dismiss, Memorandum in Support and attached exhibits as Exhibits to this Motion and respectfully request that should the Court grant this Motion, that the Court instruct the Clerk of Court to file these documents with a March 26, 2010 file date.

WHEREFORE, for the reasons set forth above, pursuant to Local Rule 7(e), Defendant the Turkish Republic of Northern Cyprus ("TRNC") hereby moves this Court for an Order to allow Defendant TRNC leave to file an overlength memorandum in support of its Motion to Dismiss Plaintiffs' Second Amended Complaint.

Dated March 26, 2010                              Respectfully submitted,


**/s/ Steven R. Perles**                          **/s/ David S. Saltzman**
Steven R. Perles (No. 326975)                     David S. Saltzman (No. 436201)
Edward MacAllister (No. 494558)                   SALTZMAN & EVINCH, PC
PERLES LAW FIRM, PC                               655 15th Street, N.W.
1146 19th Street, NW                              Suite 225-F
5th Floor                                         Washington, DC 20005
Washington, DC 20036                              Telephone: (202) 637-9877
Telephone: (202) 955-9055                         Telefax: (202) 637-9876
Telefax: (202) 955-3806

Attorneys for Defendant Turkish Republic of Northern Cyprus

UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA

Toumazou,                                    )
     et al.,                          )
            )
     Plaintiffs,                       )   Civil Action No. 09-1967
            )   Judge Paul L. Freidman
       v.                       )
            )
Turkish Republic of Northern Cyprus          )
            )
     et al.,                          )
     Defendants.                       )
_____ )

## **ORDER**

    This matter having come before the Court on the TRNC's Motion for an Order to allow Defendant TRNC leave to file a memorandum in support of its Motion to Dismiss Plaintiffs' Second Amended Complaint in excess of the applicable page limitation, and the Court having been duly advised,

    IT IS HEREBY ORDERED AND ADJUDGED that the Motion is hereby GRANTED.

The Clerk is hereby order to file the Motion to Dismiss, Memorandum in Support and attached Exhibits with a March 26, 2010 file date.

    IT IS SO ORDERED on this the _____ day of _____, 2010.


            _____
            United States District Court Judge

## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF COLUMBIA

Toumazou,                                )
et al.,                                  )
                                         )
Plaintiffs,                              )   Civil Action No. 09-1967
                                         )   Judge Paul L. Freidman
v.                                       )
                                         )
                                         )
                                         )
Turkish Republic of Northern Cyprus      )
et al.                                   )
                                         )
 Defendants.                             )
                                         )
_____ )

## DEFENDANT TURKISH REPUBLIC OF NORTHERN CYRPUS' MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT FOR LACK OF PERSONAL JURISDICTION AND IMPROPER VENUE AND TO DISMISS THE CLAIMS OF MICHALI TOUMAZOU PURSUANT TO LOCAL RULE 5.1(E)

The Turkish Republic of Northern Cyprus ("TRNC") hereby moves for an entry

of an Order dismissing the entirety of Plaintiffs' Second Amended Complaint for lack of

personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2) and improper venue pursuant to

Fed. R. Civ. P. 12(b)(3) or in the alternative to dismiss the claims of Michali Toumazou

pursuant to Local Rule 5.1(e).  The TRNC expressly reserves the right to file further

motions to dismiss the Amended Complaint based on other defenses such as lack of

subject matter jurisdiction and failure to state a claim, should the Court assert personal

jurisdiction over the TRNC.

The Amended Complaint is a political document filed by three non-residents of

the District of Columbia who ostensibly seek redress for alleged property dispossession

that occurred in 1974 on the Island of Cyprus.  The Court should dismiss this Amended

Complaint for its manifest failure to plead a sufficient jurisdictional nexus between the

alleged injuries and the District of Columbia.  Additionally, the TRNC's contacts with

this forum are so slight and unrelated to the causes of action pled by Plaintiffs that the

TRNC could have never reasonably foreseen that it might be sued in the District of

Columbia for the alleged injuries.  The fatal deficiency in Plaintiffs' personal jurisdiction

case is also fatal for Plaintiffs' case for venue.  And finally, Plaintiffs' failure to abide by

the local civil rules should result in the dismissal of the claims of at least one of the

Plaintiffs.

      The TRNC attaches a Memorandum of Points and Authorities with exhibits in

support of its Motion.

Dated March 26, 2010                        Respectfully submitted,


**/s/ Steven R. Perles**                    **/s/ David S. Saltzman**
Steven R. Perles (No. 326975)          David S. Saltzman (No. 436201)
Edward MacAllister (No. 494558)       SALTZMAN & EVINCH, PC
PERLES LAW FIRM, PC                 655 15th Street, N.W.
1146 19th Street, NW                   Suite 225-F
5th Floor                              Washington, DC 20005
Washington, DC 20036                Telephone: (202) 637-9877
Telephone: (202) 955-9055           Telefax: (202) 637-9876
Telefax: (202) 955-3806

Attorneys for Defendant
Turkish Republic of Northern Cyprus

**UNITED STATES DISTRICT COURT FOR**
**THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| Toumazou, | ) | |
| et al., | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No. 09-1967 |
| | ) | Judge Paul L. Freidman |
| v. | ) | |
| | ) | |
| | ) | |
| | ) | |
| Turkish Republic of Northern Cyprus | ) | |
| et al. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| _____ | ) | |

## <u>COUNTERSTATEMENT OF FACTS</u>

**Historical Background:**[1]

      As described by now-Chief Judge Royce Lamberth in a decision from this Court

in the strikingly similar case, *Crist v. Turkey*, 995 F. Supp. 5, 7 (D.D.C. 1998): "[t]he

tumultuous history of this Mediterranean island sets the backdrop of this current

litigation. Prior to its annexation to Great Britain, Cyprus was controlled largely by the

Ottoman Turks for several hundred years. In the late nineteenth century, Great Britain

acquired Cyprus from the Ottoman Empire by agreement and in 1925, Cyprus became a

Crown Colony of Great Britain."   As Judge Lamberth wrote "[a] Greek Cypriot

movement for union with Greece accelerated after World War II, punctuated by acts of

terrorism and violence directed against Turkish Cypriot and British opponents, while the

Turkish minority pressed for partition between Greek and Turkish Cypriots."

---

[1] *See generally* Pierre Oberling, *The Road to Bellapais* (1975) (describing the history of
the Turks of Cyprus).

When Great Britain decided to decolonize the Island, Colonial Secretary Alan Lennox-Boyd pledged in the House of Commons on December 19, 1956 that, "it will be the purpose of Her Majesty's Government to ensure that any exercise of self-determination should be effected in such a manner that the Turkish Cypriot community, no less than the Greek Cypriot community, shall in the special circumstances of Cyprus be given freedom to decide for themselves their future status."[2]

**Foundation and Operation of the Republic of Cyprus:**

Unable to countenance continued armed strife on the island, Greece, Turkey, and Great Britain concluded three treaties collectively referred to as the London-Zurich Agreements.  A compromise joint government with majority Greek representation was approved in 1959, and one year later, Cyprus became an independent republic.  The President-elect (Archbishop Makarios III) as well as the Vice-President-elect (Dr. Fazıl Kutchuk) signed all of the documents that gave birth to the Republic of Cyprus.

Turkey, Greece and the United Kingdom ratified the Treaty of Guarantee[3], which assured the independence of the new state, while the Treaty of Alliance between Turkey, Greece, and Cyprus provided for the island's security.  The Republic of Cyprus was universally recognized and given a seat at the United Nations.

When the Republic of Cyprus was founded in 1960, it was a bi-communal state in which the Greek Cypriot and Turkish Cypriot communities had the status of co-founders

---

[2] *See*, *Cyprus (Lord Radcliffe's Proposals)*, HC Deb 19 December 1956 vol 562 cc1267-79, available at: http://hansard.millbanksystems.com/commons/1956/dec/19/cyprus-lord-radcliffes-proposals.

[3] 382 U.N.T.S. 4 No. 5475 (Aug. 16, 1960); *See* MacDonald, *International Law and the Conflict in Cyprus*, 19 Can. Y.B. Int'l L. 3,4 (1981).

and equal partners.   Turkish Cypriots comprised one fifth of the island nation's total population.   They felt safe and looked forward to many years of peace and prosperity under the Constitution of 1960, which secured the rights of both communities.

The Constitution of 1960[4] provided *inter alia*:   both Turkish and Greek were to be the official languages; the executive branch would consist of a Greek Cypriot president and a Turkish Cypriot vice president; a Council of Ministers supporting the executive branch would consist of 10 members, 3 Turkish Cypriots and 7 Greek Cypriots; a Turkish Cypriot was to be given leadership over at least one of the key ministries, defense, foreign affairs, or finance, and the 50-seat House of Representatives would reserve 15 seats for Turkish Cypriots and 35 for Greek Cypriots.   The House of Representatives was empowered to legislate over almost any matter by vote of a simple majority.   Where legislation involved taxation, municipal affairs, and modifications of the electoral law, separate majorities of both the Greek Cypriot and Turkish Cypriot members were needed for passage.

**The Destruction of the Constitutional Order:**

The first president of the Republic of Cyprus, Archbishop Makarios, unfortunately regarded the nation's independence as but a stepping-stone toward *Enosis*, the unification of Cyprus with Greece.   Makarios flew the flag of Greece over the Presidential Palace in Nicosia and on the fenders of his official limousine.[5]   On July 28, 1960 Makarios said, "the agreements do not form the goal - they are the present and not

---

[4] Constitution of the Republic of Cyprus (1960); *See* Thomas & Thomas, *The Cyprus Crisis 1974-75:   Political-Juridical Aspects*, 29 Sw. L.J. 513, 514 (1975).

[5] Oberling, at 69.

the future.  The Greek Cypriot people will continue their national cause and shape their future in accordance with their will."  In a speech in his native village of Panayia on September 4, 1962, he ominously warned, "[u]nless this small Turkish community forming a part of the Turkish race which has been the terrible enemy of Hellenism is expelled, the duties of the heroes of EOKA can never be considered as terminated."[6] EOKA was the Greek Cypriot guerrilla organization that had fought against British rule in the 1950s.  EOKA, which had never fully dissolved, was rearmed in the 1960s to bring about *Enosis* in spite of the Treaty of Guarantee, which explicitly stated in its second article that "Greece, Turkey and the United Kingdom . . . undertake to prohibit . . . any activity aimed at promoting directly or indirectly, either union of Cyprus with any other State or partition of the Island."[7]

Simultaneously, Minister of the Interior Polykarpos Yorgadjis, who, perhaps ironically, was responsible for maintaining peace within Cyprus, conducted rallies in support of *Enosis*.  Yorgadjis publicly proclaimed:  "[t]here is no place in Cyprus for anyone who is not Greek, who does not think Greek and who does not constantly feel Greek."[8]  Yorgadjis, along with future Greek Cypriot leaders, Tassos Papadopoulos and Glafcos Clerides, formulated the "Akritas Plan" to achieve *Enosis* under the pretext of constitutional reform.  The plan was first openly acknowledged when it was published in the newspaper, *Patris*, in Greece on April 21, 1966.  According to the Akritas Plan the Turkish Cypriots would be presented a series of proposed amendments to the

---

[6] Osman Örek, *Makarios and Enosis*, 22 (1974).

[7] 382 U.N.T.S. 4 No. 5475 (August 16, 1960).

[8] Oberlng, at 68.

Constitution of 1960.  Among the proposed amendments was the revocation of the right of Turkish Cypriots to veto decisions affecting the future status of the island, as well as the right to form municipalities.  Anticipating that the Turkish Cypriots would reject the proposed amendments, the Plan provided that should the Turkish Cypriots react strongly, they would at once be subdued by overwhelming force.[9]

According to plan, thirteen proposed amendments were submitted to the Turkish Cypriot leadership on November 30, 1963.  A constitutional crisis immediately ensued, paralyzing the government.[10]  Meanwhile, EOKA commenced a new campaign of aggression.[11]  On December 23, EOKA guerillas slaughtered 25 Turkish Cypriot patients at the Nicosia General Hospital.  On December 24, the Turkish Cypriot quarters in the villages of Ayios Vasilios and Skilloura were attacked, resulting in 21 deaths.  Next, Archibishop Makarios dismissed all of the Turkish Cypriot cabinet ministers, members of the House of Representatives, and diplomats to the United Nations and other foreign capitals.  The Turkish Cypriot community of Cyprus was thus instantly deprived of representation and what remained of its security.[12]

---

[9] The Akritas Plan is reprinted in Necati Ertekun, *The Cyprus Dispute*, 165 (1984).  *See also* J. Reddway, *Burdened with Cyprus*, 133-34 (1986) (describing the Plan as a blueprint for securing Greek dominance on the island); Richard A. Patrick, *Political Geography and the Cyprus Conflict*, 37-38 (1976) (interview with Glafcos Clerides, then leader of the Greek Cypriot delegation to the Cypriot House of Representatives, confirming the existence of the Plan.)

[10] Ehrlich, *Cyprus, The Warlike Isle: Origins of the Current Crisis*, 18 Stan. L. Rev. 1021, 143 n. 95 (1966).

[11] H. Scott Gibbons, *Peace Without Honor*, 10 (1969).

[12] *Report of the Secretary General on Recent Developments in Cyprus*, U.N. Doc. S/6569, paras. 10, 11 (July 29, 1965).  *See* M. Tamkoç, *The Turkish Cypriot State: The Embodiment of the Right of Self Determination*, 74 (1988).

A subsequent request of the Turkish Cypriot members of the House of Representatives to return to their seats, conveyed by UNFICYP (the United Nations Peacekeeping Forces in Cyprus), was countered by conditions put forward by Mr. Clerides, the Speaker of the House.[13]  The Turkish Cypriot parliamentarians would have to accept, *inter alia,* the statutory changes made to the Constitution in their absence by the Greek Cypriot members only.  These acts of the Greek Cypriot side sealed the collapse of the bi-communal Republic.

Judge Ernst Forsthoff, the neutral President of Cyprus' Supreme Constitutional Court told *Die Welt* newspaper on December 27, 1963 that "Makarios bears on his shoulders the sole responsibility of the recent tragic events.  His aim is to deprive the Turkish community of their rights."   In an interview with the UPI press agency on December 30 Judge Forsthoff added "[a]ll this happened because Makarios wanted to remove all constitutional rights from the Turkish Cypriots."

In February 1964, United States Undersecretary of State, George W. Ball, visited Cyprus and declared that President Makarios was turning the island into his "private abattoir", concluding that the Greek Cypriots "just want to be left alone to kill Turkish Cypriots."[14]  Ball added in his memoir that "Makarios' central interest was to block off Turkish intervention so that he and his Greek Cypriots could go on happily massacring Turkish Cypriots.  Obviously we would never permit that."[15]  Unfortunately, neither the

---

[13] *Id.*, paras. 7 – 11.

[14] Lawrence Stern, *The Wrong Horse*, 84 (1977).

[15] James A. Bill, *George Ball: Behind the Scenes of U.S. Foreign Policy*, 184 (1998).

U.S., Great Britain, nor the U.N. would take effective action to prevent it.  Only Turkey intervened to protect the safety of the Turkish Cypriots and not until 11 years later.

Through 1964 as hostilities escalated, the Turkish Air Force conducted several limited air strikes that calmed the situation slightly.  The U.S. then convinced Turkey that unilaterally exercising its right to intervene under the Treaty of Guarantee would be premature, primarily by a June 5, 1964 letter from President Lyndon Johnson to Turkey's Prime Minister.

During the next two years, the now stateless Turkish Cypriots were herded into small enclaves representing three percent of the island's geographic area.[16]  They were denied all government services but for the issuance of exit visas to leave the island permanently.

The Greek Cypriot community took over all the powers and functions of the bi-communal Republic of Cyprus contrary to the London-Zurich Agreements of 1960.  That government has continued since December 1963 to function as a purely Greek Cypriot administration.   The Greek Cypriot parliament also unconstitutionally changed the entrenched articles of the 1960 Constitution through the passage of ordinary law, such as those articles relating to the Judiciary (e.g. abolition of the Supreme Constitutional Court), separate municipalities, elections, etc., thus unilaterally abrogating the rights bestowed upon the Turkish Cypriots under the 1960 agreements.[17]  Moreover, the Greek

---

[16] *See* U.N. Doc. S/5950, paras. 29, 30, 177, 180; Oberling, at 146 (displaying a map of the enclaves).

[17] And on February 19, 2010, the Greek Cypriot House of Representatives unanimously passed a resolution stating that the Treaty of Guarantee of 1960 is no longer applicable to the island.

Cypriot parliament adopted on June 26, 1967 the following resolution, which has not been repealed:

> Interpreting the age-long aspirations of the Greeks of Cyprus, the House declares that despite any adverse consequences it would not suspend the struggle being conducted with the support of all Greeks, until the struggle ends in success through the union of the whole and undivided Cyprus with the motherland, [Greece] without intermediary stage.

In late 1967, fierce attacks against the Turkish Cypriots resumed, this time under the guise of the "Cypriot National Guard" which had been established by General George Grivas, a retired officer from Greece who believed that *Enosis* was best achieved by force. Archbishop Makarios, who regarded General Grivas as a dangerous fanatic, asked the Greek government to limit Grivas' powers.[18] Nevertheless, after forcibly disarming all of the UNFICYP troops in Larnaca, Grivas' National Guard attacked the villages of Ayios, Theodoros and Kophinoi.[19]

Shortly after, on November 17, 1967, the Turkish Parliament authorized the government to go to war with Greece itself should the Cyprus situation deteriorate further. As Turkey and Greece neared the brink of war, they reached a bilateral agreement by which General Grivas was to be recalled to Greece, Archbishop Makarios was to dissolve General Grivas' National Guard, and compensation was to be paid to the victims of the Ayios, Theodoros and Kophinoi atrocities. In spite of this agreement, the National Guard remained intact and no compensation was paid. Makarios continued his policy of economic strangulation of the Turkish Cypriot enclaves, many of which were crowded with farmers who no longer had access to their lands and thus lacked an ability

---

[18] Oberling, at 131.

[19] *Id.*, at 138-140.

to earn a living.[20]   The U.N. Secretary-General reported on September 10, 1964 that "[t]he economic restrictions being imposed against the Turkish Cypriot communities, which in some instances has been so severe as to amount to veritable siege, indicated that the Government of Cyprus seeks to force a potential solution by economic pressure." [21]

In late 1973, General Dimitrios Ionnides seized power in Athens by coup d'etat. Tired of Archbishop Makarios' cautious approach to *Enosis*, General Ionnides overthrew the Makarios government and installed Nicos Sampson as President of Cyprus.  Almost at once, Sampson and a newly reconstituted "EOKA-B" embarked upon a massacre of Makarios' cohorts on Cyprus.  Hundreds of Greek Cypriots were butchered in less than one week.  But the predominant target was the Turkish Cypriot community.  The Greek newspaper *Eleftherotipia* published an interview with Nicos Sampson on February 26, 1981 in which he declared "[h]ad Turkey not intervened I would not only have proclaimed *Enosis*, I would have annihilated the Turks in Cyprus."  The leader of the Turkish Cypriot community, Rauf Denktash, stated that Sampson's leadership of Cyprus was "as unacceptable as Adolf Hitler would be as president of Israel."[22]

**The Turkish Military Intervention:**

Between 1964 and 1974, 20,000 Greek troops had covertly entered Cyprus in preparation for the final push toward *Enosis*.[23]  On July 19, 1974, Archbishop Makarios

---

[20] *Id.*, at 141-142.

[21] U.N. Doc. S/5950.

[22] Taki Theodoracopoulos, *The Greek Upheaval: Kings, Demagogues & Bayonets*, 50 (1978).

[23] Oberling, at 138.

told the UN Security Counci,  "I do not yet know the details of the Cyprus crisis caused by the Greek military regime.  I am afraid that the number of losses is great . . . I considered the danger from Turkey lesser than the danger from Greek army officers."  Turkey, fearing a broader war, called for an emergency meeting in London with the United Kingdom and Greece, the other parties to the Treaty of Guarantee.  The Greek government chose not to attend.  After conferring with the United Kingdom, Turkey then invoked the Treaty of Guarantee and intervened on July 20, 1974.  The initial battle lasted two days, by which time Turkish forces gained the advantage and agreed to a cease-fire in accord with Resolution 353 of the United Nations Security Council of July 20, 1974.[24]

The original zone of operations encompassed only a narrow strip of land along the Kyrenia-Nicosia highway between the port in Kyrenia and the inland capital of Nicosia.  Although the Turkish intervention caused the swift fall of the Greek junta in Athens and the reestablishment of the Makarios government in Cyprus, the slaughter of Turkish Cypriot villagers outside of the Turkish zone of military operations intensified as the Cypriot National Guard, now fortified with troops and materiel from Greece, and EOKA-B stepped up their campaigns with heightened vengeance.  Six Turkish enclaves were nearly entirely wiped out.  Mass murders of over one hundred women and children took place in Murataǧa, Atlılar and Sandallar.  Responding with the intention to establish a safe haven large enough to accommodate the entire Turkish Cypriot population on the island, on August 14, 1974, the Turkish Army recommenced military action.  By the

---

[24] *See* Patrick L. Townsend, *Vertical Assault: The Proof is in the Doing*, Proceedings of the U.S. Naval Inst., Nov. 1977.

cease-fire of August 16, 1974, most of the northern third of Cyprus had come under the administrative control of the Turkish Army.

**Post-War Population Exchanges:**

The fighting over, representatives of the two communities met under U.N. auspices to stabilize the situation.  Already populations were on the move.  Under the "good offices" mission of the U.N. Secretary General, the population exchanges were formalized.  The U.N. Secretary General recorded the parties' agreement:

> 1. The Turkish Cypriots at present in the south of the island will be allowed, if they want to do so, to proceed north with their belongings under an organised programme and with the assistance of UNFICYP.
>
> 2. Mr. Denktash [the Turkish Cypriot leader] reaffirmed, and it was agreed, that the Greek Cypriots at present in the north of the island are free to stay and that they will be given every help to lead a normal life, including facilities for education and for the practice of their religion, as well as medical care by their own doctors and freedom of movement in the north.
>
> 3. The Greek Cypriots at present in the north who, at their own request and without having been subjected to any kind of pressure, wish to move to the south, will be permitted to do so."[25]

By this means the voluntary division of the island into two zones, a Turkish Cypriot north and Greek Cypriot south, was realized.

Two separate and exclusive administrations thus came into being in Cyprus.  The separate status of the two communities was reinforced not only by the Vienna population exchange agreement noted above, but also by the Geneva Declaration of 1974 in which the two community leaders, Makarios and Denktash "noted the existence in practice in the Republic of Cyprus of two autonomous administrations, that of the Greek Cypriot

---

[25] U.N. Doc. S/11789.  *See* U.N. Doc. S/11900, paras. 10, 31, 36 (December 8, 1975).

community and that of the Turkish Cypriot community."[26]

The United Nations spurred a series of intercommunal talks, but with Makarios' sudden death in August 1977, a stalemate emerged.  The new Greek Cypriot leader, Spyros Kyprianou, was intransigent in the face of U.N. efforts to continue talks.

Turkey's military intervention has since been declared lawful under the Treaty of Guarantee of 1960 by the Standing Committee of the Consultative Assembly of the Council of Europe[27] and the Select Committee of the British House of Commons.[28]

**Turkish Cypriot Self-Administration:**

Meanwhile, the stateless Turkish Cypriots in northern Cyprus began to administer themselves.[29]  The administration eventually assumed all of the functions of a separate government.  In February 1975, it began calling itself the Turkish Federated State of Cyprus in hopes of facilitating a federal settlement on the island.  Then in 1983, formal independence was declared under the name of the Turkish Republic of Northern Cyprus (the "TRNC").

Today, the TRNC comprises that part of the island of Cyprus north of the United Nations controlled Green Line.  It is governed as a democratic republic.  The President is

---

[26] H.M.S.O. (Her Majesty's Stationery Office) Misc. 30 (1974), Cmnd. 5712.

[27] 1976 Eur. Y.B. (Council of Eur.) 432.

[28] Gr. Brit. H.C., *Select Committee Report on Cyprus, 1975-76,* 17 Sessional Papers.  *See* E. Lauterpacht, *Turkish Republic of Northern Cyprus: The Status of the Two Communities in Cyprus*, U.N. Doc. A/44/968 S/21463 (1990) (stating, "The British Government, though expressing positive agreement with [the view of the Select Committee], has never – despite repeated opportunities – denied it.").

[29] *See* Blay, *Self Determination in Cyprus: The New Dimensions of an Old Conflict*, 10 Austl. Y.B. Int'l L. 67, 71-72 (1984).

considered the head of state, the Prime Minister the head of the government.   Its legislature is composed of 50 members proportionally representing five electoral districts. The TRNC judiciary is independent of the other branches of government.   Freedom House, an independent watchdog organization that advocates for democracy and human rights, rates the TRNC as "Free."

Though the TRNC is not recognized by any state other than Turkey, the TRNC's President regularly meets high government officials and foreign leaders from the U.S. Secretary of State, the Secretary General of the U.N., the European Commission President, the British Prime Minister, and the leaders of the member states of the Organization of the Islamic Conference, in which the TRNC is an observer member.

Turkish Cypriots still hope to form some kind of federation with Greek Cypriots. And although the United States formally recognizes only the Greek Cypriot government, it openly promotes a bi-zonal, bi-communal federation on the island.[30]

**Property on the Island and the Annan Plan:**

It is now universally accepted that the territorial aspect of a future Cyprus settlement will be based on the principle of bi-zonality and that the territory under the administration of each constituent state will be adjusted through the process of

---

[30] *See*, *e.g.,* Statement of U.S. Secretary of State (March 8, 2010) ("I reiterated our support for the Cypriot-led negotiations under the auspices of the UN Secretary General's Good Offices Mission, led by Alexander Downer. I commend both Cypriot leaders on their hard work in these settlement talks and on the progress that they are making.") available at: http://www.state.gov/secretary/rm/2010/03/137951.htm,; Statement of U.S. Assistant Secretary of State for European and Eurasian Affairs (March 17, 2010) ("We commend both Cypriot leaders for their efforts and urge them to seize this window of opportunity to pursue negotiations leading to a settlement that reunifies Cyprus into a bi-zonal and bi-communal federation.") available at: http://turkey.usembassy.gov/statement_031710.html.

negotiation within the framework of talks under United Nations auspices.  The parties have affirmed their support for a federal solution of the constitutional aspect and a bi-zonal solution of the territorial aspect of the Cyprus problem, most recently in a joint statement issued by Turkish Cypriot leader Talat and Greek Cypriot leader Christofias following their meeting of May 23, 2008, in which they "reaffirmed their commitment to bi-zonal, bi-communal federation with political equality, as defined by relevant Security Council resolutions.  This partnership will have a federal government with a single international personality, as well as a Turkish Cypriot constituent state and a Greek Cypriot constituent state, which will be of equal status."[31]  An attempt to implement this proposed structure was made in the U.N. sponsored "Annan Plan," which put referenda before the two communities.

The Annan Plan envisaged a federal solution that would create the "United Cyprus Republic" composed of two constituent states, the Greek Cypriot state and the

---

[31] The principles of "bi-communality" and "bi-zonality" for a Cyprus solution find expression in various United Nations resolutions from 1974 onwards. *e.g.* Security Council Resolution 3212 of November 1, 1974 (referring to the two Cypriot communities as the basis of the state's constitutional order, and offering the Secretary General's "good offices" in negotiations between the two communities), available at: http://daccess-dds-ny.un.org/doc/RESOLUTION/GEN/NR0/738/14/IMG/NR073814.pdf?OpenElement, Security Council Resolution 774 of August 26, 1992 (stating that the U.N. "Reaffirms its position that a Cyprus settlement must be based on [a single state with] two politically equal communities … in a bi-communal and bi-zonal federation"), S/Res/744 (1992), Security Council resolution 750 of April 10, 1992 ("Endorses the set of ideas described in paragraphs 17 to 25 and paragraph 27 of the Secretary-General's report [S/23780] as an appropriate basis for reaching an overall framework agreement, subject to the work that needs to be done on the outstanding issues, in particular on territorial adjustments and displaced persons, being brought to a conclusion as an integrated package mutually agreed upon by both communities"), available at: http://daccess-dds-ny.un.org/doc/RESOLUTION/GEN/NR0/011/09/IMG/NR001109.pdf?OpenElement, and the Ghali "Set of Ideas" of July 1992, on which Security Council Resolution 774 was partly based.

Turkish Cypriot state.[32]   The accepted authority of the TRNC government over the people and territory of northern Cyprus stands at the core of the approach adopted by the U.N. Secretary-General and endorsed by the international community for the resolution of the Cyprus conflict.   This is evident in the submission of the Annan Plan to separate referenda in the north and south of the island on an equal footing.   Indeed, the April 24, 2004 referendum in the TRNC was carried out under the laws and by the authorities of the TRNC, just as it was carried out in southern Cyprus under the laws of the Greek Cypriot government.

Significantly, the Annan Plan also acknowledged that the reciprocal issue of property in Cyprus required a *sui generis* solution.   Article 1 of Annex VII entitled "[t]reatment of property affected by events since 1963" stated clearly that it was dealing with "properties which were affected as a consequence of inter-communal strife, military action or the unresolved division of the island since 1963."[33]   If approved by dual referenda, the unified entity created by the Annan Plan would have entered the European Union.   The Turkish Cypriots voted to approve the Annan Plan, with 65 percent in favor. The Greek Cypriots voted to reject the plan, with only 24 percent in favor.   Thus, the Annan Plan failed. Though the Annan Plan failed because of the Greek Cypriot rejection, its stands as a reflection of the widely-endorsed desire of the international community to strike a fair balance between the two Cypriot communities in the resolution of the Cyprus conflict, as well as the fact that the Turkish Cypriot community continues to be treated by

---

[32] *Basis for Agreement on a Comprehensive Settlement of the Cyprus Problem* ("The Annan Plan") 2004, is available at: http://www.unficyp.org/nqcontent.cfm?a_id=1637.

[33] The Annan Plan, Part I, Article 1.

the U.N. Secretary-General as an entity of inherently equal status to the Greek Cypriot community.

Despite the failure of the United Nations-sponsored referenda, as of May 1, 2004 the European Union ("E.U.") has considered the whole island of Cyprus part of the E.U. E.U. legislation is deemed "suspended" in the TRNC, though the E.U. considers Turkish Cypriots to be E.U. citizens.  The E.U. approved €259 million, or approximately $360 million, in aid to Turkish Cypriots on February 27, 2006.[34]

The current round of negotiations between President Talat on behalf of the Turkish Cypriot community and President Christofias on behalf of the Greek Cypriot community has been ongoing for 18 months and has comprised over 60 meetings.

Leaders of both Cypriot communities, the United Nations Secretary General, the European Union Commission on Enlargement and most commentators have stated that a workable solution to the various property claims on the island is essential to finding a durable political settlement on the island and, therefore, it remains one of the central issues in negotiations.  As stated in the May 27, 2005 Report of the Secretary-General on the United Nations operation in Cyprus: "[t]he prospect of an increase of litigation in property cases on either side poses a serious threat to people-to-people relationships and to the reconciliation process and to the reconciliation process.  *Property rights continue to be an extremely sensitive issue on both sides and it is widely believed that only a comprehensive settlement of the Cyprus problem can bring closure to the property issue*."[35]  And quite recently, on March 10, 2010, the Greek Cypriot President Christofias

---

[34] *See*, Website of the European Commission in Cyprus, http://ec.europa.eu/cyprus/turkish_community/index_en.htm).
[35] U.N. Doc. S/2005/353 (emphasis added).

declared, "[T]he property issue, as well as other aspects of the Cyprus problem, will be solved at the negotiating table."[36]

**Cyprus Property Litigation in Other Fora:**

Courts in southern Cyprus, a commission in northern Cyprus and the European Court of Human Rights all have considered land claims of Greek Cypriots seeking compensation for their abandoned properties in northern Cyprus and have provided legal relief.  It would be erroneous, therefore, to suggest that relief outside the U.S. court system is impossible.  To the contrary, local fora exist to address these issues both on the island of Cyprus and within the European Union without regard to the ethnicity of the applicant.

In the wake of the post-conflict population exchanges in 1975, properties lay abandoned in both northern and southern Cyprus and refugees on both sides of the island sought to establish their lives anew.  The nascent Turkish Federated State of Cyprus adopted a law whereby Turkish Cypriots who had abandoned real property in southern Cyprus could be distributed properties of equal value abandoned by Greek Cypriots in northern Cyprus.[37]  In order to receive an abandoned property in the north, the Turkish Cypriot would be required to renounce all rights to his or her former property in the

---

[36] Speeches and Statements of the President [of the Republic of Cyprus], available at: http://www.presidency.gov.cy/presidency/presidency.nsf/257dd326cd3d2743c225751500 33e6a7/385cd348a973abd0c22576f0002157d2?OpenDocument

[37] This law is now encompassed within TRNC Law 67/2005 of December 22, 2005, the "Law for the Compensation, Exchange and Restitution of the Immovable Properties Which are Within the Scope of Sub-Paragraph (B) of Paragraph (1) of Article 159 of the [TRNC] Constitution."

south, which would avoid awarding a windfall upon eventual unification of the island.
Meanwhile, the Greek administration in southern Cyprus likewise requisitioned all
Turkish Cypriot properties and eventually established a Turkish Cypriot property
management department to hold abandoned Turkish Cypriot properties in trust.   It,
however, forbade all Turkish Cypriots of disposing of such property until the island is
united, regardless of whether they renounced their rights.

These dual systems have been challenged in a variety of recent cases, all in
Europe.  No American court has granted jurisdiction over such claims.  An example of a
case challenging the system in southern Cyprus is the matter of Nezire Sofi, a Turkish
Cypriot, who had filed suit in the European Court of Human Rights ("ECHR").[38]  Days
before oral argument was to commence on January 28 of this year, the Greek Cypriot
government agreed to settle the case, conceding publicly that its law preventing Turkish
Cypriots from disposing of their property violated the European Convention on Human
Rights and agreeing to pay Ms. Sofi €500,000 and to amend its law.[39]

---

[38] *Sofi v. Cyprus*, European Court of Human Rights (no. 18163/04).

[39] This was a representative case.  As described in the March 11, 2008 State Department
Report on Human Rights in Cyprus, available at:
http://www.state.gov/g/drl/rls/hrrpt/2007/100554.htm, "Turkish Cypriots have filed a
total of 43 cases in the courts to reclaim property located in the government-controlled
area, eight of which were new cases filed during the year. During the year the courts
dismissed five property cases because they concerned Turkish Cypriot properties that are
under the guardianship of the Ministry of Interior. According to the law, these properties
cannot be returned unless the owners resettle permanently in the government-controlled
area. The applicants filed appeals and the cases were pending before the Supreme Court
at year's end."  The *Sofi* case should resolve the remaining cases.  And contrary to an
allegation in Plaintiffs' Second Amended Complaint, at present, the U.S. State
Department does not issue warning about the title of property in northern Cyprus, rather
the website of the Bureau of Consular Services, available at:
http://travel.state.gov/travel/cis_pa_tw/cis/cis_1098.html, states, "American Citizens who
buy or lease property, particularly in the area administered by Turkish Cypriots, may find

An example of a case challenging the system in northern Cyprus is the matter of David and Linda Orams in which a Greek Cypriot who had abandoned his property in northern Cyprus sued the subsequent owners, British nationals, for rent, restitution and other damages at the Nicosia District Court in southern Cyprus.  The court issued a default judgment in favor of the plaintiff, Mr. Meletios Apostolides, and he was eventually able to get the judgment enforced outside of southern Cyprus pursuant to a European Court of Justice decision.[40]  ECHR decisions are binding on United Kingdom courts, therefore, the United Kingdom Court of Appeal upheld the ECHR decision on January 19 of this year.  A separate appeal of the European Court of Justice decision remains under submission.

Earlier, compensation in the amount of 320,000 Cyprus Pounds, or approximately $750,000, was awarded to a Greek Cypriot who had abandoned property in northern Cyprus in the case of *Loizidou v. Turkey*.[41]  Following this verdict, approximately 1,400 similar cases were filed with the ECHR.  And in *Demades v. Turkey*,[42] an award of €835,000, or approximately $1.15 million, was ordered.

To more fully adjudicate the claims of those who may have abandoned property in northern Cyprus and alleviate the need of claimants to appeal to the European Court of

---

their ownership challenged by people displaced as a result of the 1974 conflict.  Prospective property buyers should always seek legal advice before buying,"  This is identical to the advice given to prospective purchasers of real property in northern Cyprus who make inquiries of the TRNC Representative Office in Washington, DC.

[40] *Apostolides v. Orams*, European Court of Justice (no. C-420/07).

[41] European Court of Human Rights (no. 40/1993/435/514).

[42] European Court of Human Rights (no. 16219/90).

Human Rights, the TRNC created the Immoveable Property Commission ("IPC") in 2005. It was created also as a response to the case of *Xenides-Arestis v. Turkey*,[43] in which the ECHR spoke favorably toward the creation of a dispute resolution mechanism in the TRNC. The IPC began proceedings in 2006. Two of the six commissioners, a German national and a Swedish national, are non-Cypriot which adds credence and impartiality to the IPC's work. The IPC offers a local remedy to dispossessed Greek Cypriots, or their heirs, in the form of restitution, exchange or compensation with respect to abandoned property.[44] By no means does the statute creating and governing the IPC constitute an admission that the properties subject to its jurisdiction belong to any individual plaintiff or group of plaintiffs.[45]

As of January 21, 2010, some 445 Greek Cypriot applications have been received by the IPC. Eighty-nine claims have been settled without need for a hearing. Four claims have been settled after a full hearing. Nearly all of the claims that have settled have been on the basis of compensation. Four cases have been settled on the basis of restitution, and two cases have been settled with exchange and compensation. In one

---

[43] European Court of Human Rights (no. 46347/99). The Greek Cypriot plaintiff was awarded total damages of €885,000 or about $1.2 million.

[44] The IPC reports its Decisions and statistics at: http://www.kuzeykibristmk.org/english/index.html.

[45] *See* TRNC Law 67/2005 of December 22, 2005, the "Law for the Compensation, Exchange and Restitution of the Immovable Properties Which are Within the Scope of Sub-Paragraph (B) of Paragraph (1) of Article 159 of the [TRNC] Constitution." In Plaintiffs Second Amended Complaint in unnumbered paragraphs on pp. 7-8 and 9 asserts that the language of this law concedes that all IPC adjudications proceed from the basis that abandoned properties are presently owned by those who abandoned them, including Plaintiffs. This is a nonsensical and self-serving reading. If Plaintiffs, Cypriots one and all, truly believed in their own interpretation, then one would expect that they would raise their claims before the IPC and not seek to invoke the jurisdiction of a United States court.

case the commission ruled for partial restitution.  The total compensation paid out in settlements to date is approximately 39 million British pounds, or approximately $65 million.

Most applications to the IPC request compensation, restitution being requested in a small minority of the cases.  The case of *Demopoulous v. Turkey*, challenging the ability of the IPC to offer a sufficient remedy was heard by the ECHR on November 18, 2009. On March 5, 2010 the Court determined that, "[TRNC] Law 67/2005 *provides an accessible and effective framework of redress in respect of complaints about interference with the property owned by Greek Cypriots*," and thus the cases of the plaintiffs were, "rejected for non-exhaustion of domestic remedies. *[The ECHR] is satisfied that Law 67/2005 makes realistic provision for redress in the current situation of occupation that is beyond this Court's competence to resolve*."[44]

In sum, property remains a central issue in negotiations to achieve a bi-zonal, bi communal comprehensive settlement to the Cyprus dispute, and these negotiations are supported not only by the two Cypriot communities, but also the United States, the United Nations and the European Union.   Until those negotiations are positively concluded, Greek Cypriots have access to several fora on the island of Cyprus and within the states and structures of the European Union to provide legal relief.

Dated March 26, 2010                            Respectfully submitted,

**/s/ Steven R. Perles**                         **/s/ David S. Saltzman**
Steven R. Perles (No. 326975)            David S. Saltzman (No. 436201)
Edward MacAllister (No. 494558)       SALTZMAN & EVINCH, PC
PERLES LAW FIRM, PC                       655 15th Street, N.W.

---

[44] European Court of Human Rights (no. 46113/99) (emphasis added).

1146 19th Street, NW                       Suite 225-F
5th Floor                                  Washington, DC 20005
Washington, DC 20036                       Telephone: (202) 637-9877
Telephone: (202) 955-9055                  Telefax: (202) 637-9876
Telefax: (202) 955-3806

Attorneys for Defendant Turkish Republic of Northern Cyprus

## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Toumazou,<br>et al.,<br><br>Plaintiffs,<br><br>v.<br><br><br>Turkish Republic of Northern Cyprus<br>et al.<br><br>Defendants. | )<br>)<br>)<br>)<br>)  Civil Action No. 09-1967<br>)  Judge Paul L. Freidman<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

### DEFENDANT TURKISH REPUBLIC OF NORTHERN CYRPUS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT FOR LACK OF PERSONAL JURISDICTION AND IMPROPER VENUE AND TO DISMISS THE CLAIMS OF MICHALI TOUMAZOU PURSUANT TO LOCAL RULE 5.1(E)

Steven R. Perles (No. 326975)
Edward MacAllister (No. 494558)
PERLES LAW FIRM, PC
1146 19th Street, NW
5th Floor
Washington, DC 20036
Telephone: (202) 955-9055
Telefax: (202) 955-3806

Attorneys for Defendant
Turkish Republic of Northern Cyprus

David S. Saltzman (No. 436201)
SALTZMAN & EVINCH, PC
655 15th Street, N.W.
Suite 225-F
Washington, DC 20005
Telephone: (202) 637-9877
Telefax: (202) 637-9876

## INTRODUCTION

The Turkish Republic of Northern Cyprus ("TRNC") is a foreign government with its capital in Lefkoşa, Cyprus.[1]  The TRNC hereby files this Motion to Dismiss Plaintiffs' Second Amended Complaint ("Amended Complaint") on the basis of the Court's lack of personal jurisdiction over the TRNC pursuant to Federal Rule of Civil Procedure 12(b)(2) and improper venue pursuant to Fed. R. Civ. P. 12(b)(3) and to dismiss the claims of Michali Toumazou pursuant to Local Rule 5.1(e).[2]  The TRNC observes that Plaintiffs' Amended Complaint is filed upon strikingly similar grounds as the complaint filed against the Republic of Turkey ("Turkey") that now-Chief Judge Royce C. Lamberth dismissed, first for expiration of statute of limitations and then for lack of subject matter jurisdiction, after remand from the United States Court of Appeals for the District Court Circuit with instructions to first consider the applicable subject matter jurisdiction requirements. *Crist, v. Republic of Turkey*, 995 F. Supp. 5, 7-8 (D.D.C. 1998).  Therefore, should the Court assert personal jurisdiction over the TRNC,

---

[1] Lefkoşa is the Turkish Cypriot half of the divided city of Nicosia.  The dividing line bisecting the city represents roughly the cease-fire line from hostilities between Greek and Turkish Cypriots in late 1963 and early 1964.  The United Nations Peacekeeping Force in Cyprus ("UNFICYP"), established in March 1964, maintains the line, sometimes known as the "Green Line."  *See "The Buffer Zone,"* UNFICYP website available at http://www.unficyp.org/nqcontent.cfm?a_id=1592&tt=graphic&lang=l1, last visited on January 26, 2010.

[2] Plaintiffs served their complaint upon a driver for the TRNC Representative, who was not authorized to accept service, in violation of the federal service rule applied to unincorporated associations.  *See* Fed. R. Civ. P. 4(h)(1)(b); *Klieman v. Palestinian Auth.*, 467 F. Supp. 2d 107, 114 (D.D.C. 2006) (finding that "plaintiffs have filed no affidavits, declarations or other evidence to establish that [the recipient] was an authorized agent for service of process or that he represented that he was, and plaintiffs [defendants] flatly deny that he was authorized or did so represent.").  The TRNC however seeks the swift administration of justice and to avoid any waste of the Court's resources, and so hereby waives this particular defect to service of process.

1

we hereby expressly reserve the right to file further motions to dismiss the Amended Complaint, based on other defenses including, but not limited to, lack of subject matter jurisdiction and failure to state a claim,

According to Plaintiffs, the TRNC in conspiracy with former co-Defendant Turkey and new Defendants HSBC Bank and assorted subsidiaries ("HSBC"), committed a litany of offenses, the gravamen of which is the dispossession of real property during Turkey's 1974 military intervention on Cyprus and its subsequent resale or use.  It is beyond dispute:

- that all of the real property at the root of the causes of action pled in the Amended Complaint is located on Cyprus, an island in the eastern Mediterranean Sea approximately 5,600 miles from the District of Columbia;

- that none of the Plaintiffs reside in the District of Columbia and only one Plaintiff perhaps resides in the United States, as a resident alien in North Carolina[3], and;

- no injury suffered in the District of Columbia has been alleged,

Finally, as demonstrated below and in the attached sworn affidavits of Mr. Hilmi Akil, Washington Representative of the Turkish Republic of Northern Cyprus, (Rep. Akil Affidavit, Exhibit 1), and Mr. Izzet Zorlu, (Zorlu Affidavit, Exhibit 2), Plaintiffs' conclusory allegations relating to the few inconsequential contacts with the District of Columbia are easily disproved and should be excluded as a matter of law.

For these and other reasons as set forth below, Plaintiffs cannot establish the prima facie showing required for the Court to assert personal jurisdiction over the TRNC,

---

[3]  Plaintiffs' failure to provide a proper address for Michali Toumazou in violation of Local Rule 5.1(e) is addressed by the TRNC in Section III below

whether pursuant to the D.C. long-arm statute, D.C. Code § 13-423, or upon any other basis. Plaintiffs' Amended Complaint should therefore be dismissed.

## PROCEDURAL BACKGROUND

Plaintiffs filed their original Complaint on October 19, 2009. The original Complaint and summons were served upon an individual then sitting in the TRNC's Representative Office in Washington, DC on October 22, 2009. The Court granted an extension of time to the TRNC to file a response on December 17, 2009, which created a February 16, 2010 deadline for the TRNC to answer or otherwise respond.

On February 16, 2010, Plaintiffs suddenly filed an amended Complaint, (Docket Entry #5), styled as an "Errata," "to correct the incorrect filing of original Class Action Complaint filed on October 19, 2009 that consisted of numerous spelling errors." But a review of this document revealed that it contains at least 34 new allegation paragraphs, three new exhibits and two new counts in addition to those present in the original Complaint, thus belying its title. (Docket Entry #5-1). Plaintiffs also voluntarily dismissed the Republic of Turkey ("Turkey"). (Docket Entry #6). Service was never affected upon Turkey. Nonetheless, the first amended Complaint, filed the same day and a few minutes before the voluntary dismissal, continued to name Turkey as a defendant in its caption and in its allegations.

The TRNC filed a motion consented to by Plaintiffs for additional time to respond to the first amended Complaint, which the Court granted, thereby extending the time to answer until March 8, 2010. On that final day, March 8, counsel for Plaintiffs requested the TRNC's consent to file a second amended Complaint and for leave to file it on March

18, 2010. The TRNC consented to this request. The Court agreed to this proposed schedule.

On the afternoon of March 18, counsel for Plaintiffs subsequently requested the TRNC's consent for a single, additional day to file their second amended Complaint, to which counsel for the TRNC could not agree, owing to the lateness of the request and the time difference between Washington, DC and Cyprus, which made it difficult for the TRNC to confer with its counsel. But, the TRNC indicated it would not oppose the request. The Court agreed to this request from Plaintiffs. Plaintiffs finally filed their Second Amended Complaint on March 19, 2010, which, though it impleaded new defendants and made numerous significant changes to the allegations, was again styled as an "Errata."

## COUNTERSTATEMENT OF FACTS

In the context of a ruling on the sufficiency of personal jurisdiction allegations, the Court in not obligated to take Plaintiffs' allegations as true. *Shirlington Limousine v. San Diego Union-Tribune*, 566 F. Supp. 2d 1, 3 (D.D.C. 2008) *citing United States v. Philip Morris, Inc.*, 116 F. Supp. 2d 116, 120 n.4 (D.D.C. 2000) ("except[ing] personal jurisdiction analysis from the general rule that all allegations must be taken as true for purposes of ruling on a motion to dismiss."). The overheated language employed in the Amended Complaint does not assist the Court in its efforts to clarify the issues for resolution. For the Court's consideration the TRNC, therefore, provides a Counterstatement of Facts with a short history of recent events that have occurred on Cyprus, attached as a separate document.

4

**JURISDICTIONAL FACTS ALLEGED BY PLAINTIFFS**

The few allegations that Plaintiffs plead in their Amended Complaint to establish personal jurisdiction over the TRNC are repetitive and conclusory.  Plaintiffs allege that the Court has personal jurisdiction over the TRNC because:

1. the "TRNC, illegally governs, sells, finances, rents, leases, advertises, taxes, profits and markets the properties, businesses and lands belonging to the Plaintiffs['] [*sic*] and the Class to others, including third parties, under a fraudulent property scheme involving HSBC, real estate brokers and other companies located in the U.S [*sic*] and elsewhere." (Compl.[4] at p. 2-3);

2. the TRNC is "actively engaged in the marketing, advertising, financing, development leasing, use or selling of properties belonging Plaintiffs and the Class", (Compl. at ¶¶ 2, 35, 45); ;

3. the TRNC "maintain[s] offices and transact[s] business in the District of Columbia." (Compl. at ¶¶ 2, 3, 109);

4. the "TRNC falsely portrays and represents that it has an 'embassy' located in Washington DC to deceive the public and the world and to wrongfully solicit and obtain funds in the advertisement, marketing financing, sale and transfer of properties belonging to the Plaintiffs and the Class." (Compl. at ¶¶ 49, 60, 109);

5. the "fraudulent scheme of the TRNC is assisted supported or directed through HSBC and/or occurs in whole or in part in the U.S." (Compl. at ¶ 35).

6. the "TRNC illegally posts on its Washington DC website false statements including but not limited to the sale of property in the north of Cyprus and also

---

[4] The Motion to Dismiss is filed in response to Plaintiffs' Second Amended Complaint and all citations in this Memorandum, e.g. (Compl. at ¶48), refer to a page or paragraph of the Second Amended Complaint only.

that it protects and respects the rights of all owners of the property located in the north," (Compl. at ¶¶ 51, 59);

7. "The TRNC facilitates the illegal encumbrances, rental, lease use or sale of property that belongs to the Plaintiffs and the Class through a systemized process that it advertises physically in Washington DC or on the internet and recommend in counsel in their representative office in Washington, D.C. . . ." (Compl. at ¶ 56);

8. The TRNC conspired to commit wrongful acts "through mail, wire transactions and/or banking transactions . . . .in the District of Columbia." (Compl. at ¶ 92); and

9. The TRNC, with "weapons equipment and arms obtained from the U.S." interferes with rights in property belonging to Plaintiffs and the Class. (Compl. at ¶¶ 7, 36).

These repetitive allegations can be condensed into three grounds by which Plaintiffs' assert that this Court has personal jurisdiction over the TRNC: (1) the TRNC engages in the marketing, advertising or otherwise facilitating of the sale of property in Northern Cyprus, and conspires with HSBC in a money laundering scheme related to that property in a manner that somehow touches the District of Columbia; (2) the TRNC maintains an office in the District of Columbia, and that office has a website pertinent to the sale of property in northern Cyprus; and (3) the TRNC utilizes arms obtained from the U.S. to interfere with Plaintiffs' property rights.[5]

---

[5] Plaintiffs' failure to attach exhibits to their Second Amended Complaint, despite their continued reference to the exhibits that were attached to the First Amended Complaint, (*see* Compl. at ¶48), compels the TRNC to respond these exhibits, although they are not

As demonstrated below, these allegations are insufficiently specific, demonstrably false, or logically impossible and therefore cannot support the Court's exercise of personal jurisdiction.

## SUMMARY OF ARGUMENT

An assertion of personal jurisdiction requires the establishment of a prima facie case of jurisdiction supported by "concrete evidence" or more than the series of conclusory and demonstrably false allegations offered by Plaintiffs. The TRNC is permitted to submit counter-evidence to disprove allegations of personal jurisdiction under the Federal Rules of Civil Procedure. The evidence submitted by the TRNC reveals a complete lack of a jurisdictional nexus between the District of Columbia and either the Plaintiffs or their causes of action. There is no tie between Plaintiffs' claims for the alleged dispossession of property on the island of Cyprus and this forum other than the TRNC Washington, DC Representative Office's alleged operation of a website that facilitates the sale of property in North Cyprus – a website that the TRNC demonstrates it has had no connection with since 2005. Plaintiffs' other jurisdictional

---

currently in the record. An examination of the exhibits reveals a troubling investigative sloppiness, which is also on display elsewhere in Plaintiffs' amended complaints. Nevertheless, none of the supposed exhibits establishes reliable evidence in favor of Plaintiffs' assertion of personal jurisdiction, including the page views of websites owned and operated by private individuals not affiliated with the TRNC government in any way. (Rep. Akil Affidavit, Exhibit 1 at ¶¶ 28-34 for discussion of websites). For example, Plaintiffs rely upon an out-of-date and superseded government bulletin to support their allegations regarding TRNC money laundering and terrorist financing. (Compl. at ¶ 48). On July 23, 2009, the U.S. Department of the Treasury fully exonerated the TRNC in its investigation of alleged money laundering and issued an advisory that explicitly overruled the one to which Plaintiffs refer. *Withdrawal of Advisory FIN-2008-A003*, U.S. Department of the Treasury Financial Crimes Enforcement Network, Advisory FIN-2009-A005 (July 23, 2009). And, none of the related exhibits provided by the Plaintiffs supply any information about activities by the TRNC. Instead they involve a private bank called First Merchant Bank, which is not a party to this lawsuit.

7

allegations are much less significant and are also easily rebutted. Indeed, though a vast and complex scheme of dispossessing, selling, fraudulently advertising, and financing potentially 170,000 properties is alleged, the Amended Complaint fails to provide the details of even a single property transaction. Instead, vague and unspecific allegations are scattered through the Amended Complaint. For example, the alleged money laundering scheme operated by HSBC "occurs in whole or in part in the U.S." or it is done "through London and/or Washington DC" and the TRNC deprives Plaintiffs of the enjoyment of their property through "U.S. obtained weapons."

Moreover, the purpose and activities of the TRNC's Representative Office in the District of Columbia are completely unrelated to the gravamen of the Amended Complaint. And because the TRNC's office and personnel here exist to interact with the U.S. government, such contacts with the forum must be excluded from the Court's personal jurisdiction analysis. Unburdened of its political freight, Plaintiffs' Amended Complaint fails to allege the prima facie case necessary to allow the Court to exercise personal jurisdiction over the TRNC and should, thus, be dismissed.

Finally, the Amended Complaint's heated rhetoric exposes that it is above all a political document that attempts to drag this Court into a controversy that has been enduring for approximately four decades and which concerns real property that has at all times relevant to this matter been located thousands of miles away on Cyprus. The Plaintiffs also ignore the existing political and legal frameworks dedicated to resolving all matters in dispute on Cyprus overseen through the tireless efforts of the elected leaders of the two communities on the island, under the supervision of the United Nations and the European Union, and with the support of the United States government. An exercise of

8

personal jurisdiction would also violate the due process clause of the U.S. Constitution by dragging into this Court the TRNC, an overseas party that had no reason to foresee being haled into this Court over this dispute.

Additionally, the fatal deficiency in Plaintiffs' personal jurisdiction case is also fatal for Plaintiffs' case for venue. The TRNC refutes Plaintiffs' allegations regarding the transaction of business in the District and proves that its Representative Office exists to interact with the U.S. Government. Venue therefore is not proper in the District of Columbia.

## ARGUMENT

### I.   THE AMENDED COMPLAINT DOES NOT ALLEGE SUFFICIENT SPECIFIC FACTS TO ALLOW THE COURT TO ASSERT PERSONAL JURISDICTION OVER THE TRNC

#### A.   FEDERAL RULE 8(a) REQUIRES PLAINTIFFS TO PERFECT A PRIMA FACIE CASE OF PERSONAL JURISDICTION WHILE PRECLUDING THE COURT FROM ACCEPTING CONCLUSORY OR DEMONSTRABLY FALSE ALLEGATIONS AS TRUE

Plaintiffs' Amended Complaint is undermined first by its failure to fulfill the requirement to establish a prima facie case of personal jurisdiction. Federal Rule 8 requires "a short and plain statement of the grounds for the court's jurisdiction." Fed. R. Civ. P. 8(a)(1). To meet this burden, specific factual allegations are required to overcome a motion to dismiss for lack of personal jurisdiction. A "plaintiff has the burden of establishing a factual basis for the exercise of personal jurisdiction over the defendant. 'The general rule is that a plaintiff must make a *prima facie* showing of the pertinent jurisdictional facts.'" *Brunson v. Kalil & Co., Inc.*, 404 F. Supp. 2d 221, 226 (D.D.C. 2005) *quoting First Chi. Int'l v. United Exch. Co., Ltd.*, 836 F.2d 1375, 1378 (D.C. Cir.

1988); *Atlantigas Corp. v. Nisource, Inc.*, 290 F. Supp. 2d 34, 42 (D.D.C. 2003).

Conclusory statements "do not constitute the *prima facie* showing necessary to carry the

burden of establishing personal jurisdiction." *First Chi. Int'l*, 836 F.2d at 1378 *quoting*

*Naartex Consulting Corp. v. Watt,* 722 F.2d 779, 787 (D.C. Cir. 1983). The Plaintiffs'

burden of a prima facie case cannot be met unless they allege "*specific facts that*

*demonstrate purposeful activity by the defendant in the District of Columbia invoking the*

*benefits and protections of its laws.*" *Brunson v. Kalil & Co., Inc.*, 404 F. Supp. 2d 221,

226 (D.D.C. 2005) (emphasis added) (citation omitted); *Atlantigas Corp.*, 290 F. Supp.

2d at 42. Such allegations as the TRNC transacts "business in the District of Columbia

related to the Plaintiffs' claims" are wholly conclusory and insufficient under that

standard. In this case, Plaintiffs have failed both to supply the requisite specific factual

allegations required to meet their Federal Rule 8 obligations, and, as demonstrated below

and in the attached exhibits, rely on demonstrably false allegations regarding the TRNC's

involvement in the sale of properties and purchase of military equipment. Thus,

Plaintiffs cannot establish the prima facie case required to allow the Court to assert

personal jurisdiction over the TRNC.

### B. SPECIFIC PERSONAL JURISDICTION CAN NOT BE ASSERTED BECAUSE PLAINTIFFS FAIL TO ALLEGE SUFFICIENT FACTS LINKING THEIR CAUSES OF ACTION TO THE DISTRICT OF COLUMBIA

To allow the Court to assert personal jurisdiction over the TRNC, Plaintiffs'

Amended Complaint must allege a factual foundation for either specific personal

jurisdiction or general personal jurisdiction. "Specific jurisdiction 'arises out of' or

'relates to' the cause of action even if those contacts are 'isolated and sporadic.' . . .

General jurisdiction arises when a defendant maintains 'continuous and systematic'

contacts with the forum state even when the cause of action has no relation to those contacts." *LSI Indus. v. Hubbell Lighting, Inc.*, 232 F.3d 1369, 1375 (Fed. Cir. 2000) *quoting Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472-73 (1985) and *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414-16 (1984). A court may assert specific personal jurisdiction over a defendant if the defendant has "certain minimum contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice." *Health Communications, Inc. v. Mariner Corp.*, 860 F.2d 460, 462, (D.C. Cir. 1988) *quoting International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). The defendant's contacts with the forum state must be such that it "should reasonably anticipate being haled into court" there. *Health Communications*, 860 F.2d at, 462, *quoting World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980).

In the present case, Plaintiffs present only two sets of allegations relevant to a specific personal jurisdiction analysis. First, they allege that the TRNC, either alone or in conspiracy with HSBC, engages in marketing, advertising or otherwise facilitating the sale of properties in northern Cyprus through the TRNC's Representative Office in Washington, DC and its website. (Compl. at ¶¶ 2, 3, 49, 51, 56, 59, 60, 109). This set of allegations is inadequate as a ground upon which the Court may rest an assertion of personal jurisdiction for two reasons: firstly the allegations rely upon a great deal of conclusory statements. And conclusory statements "do not constitute the *prima facie* showing necessary to carry the burden of establishing personal jurisdiction." *First Chi. Int'l*, 836 F.2d at 1378 *quoting Naartex Consulting Corp. v. Watt*, 722 F.2d 779, 787 (D.C. Cir. 1983). Secondly, these allegations are also flatly untrue. (Rep. Akil Affidavit,

11

Exhibit 1, at ¶23-27).  The burden to allege specific facts "excepts personal jurisdiction

analysis from the *general rule that all allegations must be taken as true for purposes of*

*ruling on a motion to dismiss*."  *Shirlington Limousine v. San Diego Union-Tribune*, 566

F. Supp. 2d 1, 3 (D.D.C. 2008) *citing United States v. Philip Morris, Inc.*, 116 F. Supp.

2d 116, 120 n.4 (D.D.C. 2000) (emphasis added).  To counter the blatantly inaccurate

allegations in Plaintiffs' Amended Complaint that are critical to the Plaintiffs' case for

personal jurisdiction, the TRNC submits a sworn affidavit as Exhibit 1.  "In fact, courts in

the District of Columbia "may consider outside evidence to make factual determinations

in disposing of a motion to dismiss for lack of personal jurisdiction."  *Id.*

       The affidavits prove that the TRNC Representative Office is completely

unrelated to Plaintiffs' causes of action and its mere existence cannot alone serve as a

basis for asserting specific personal jurisdiction.  D.C. Code § 13-423(b) "bars . . . claims

unrelated to the acts forming the basis for personal jurisdiction."  *Dickson v. United*

*States*, 831 F. Supp. 893, 897 n.5 (D.D.C. 1993) *quoting Pollack v. Meese*, 737 F. Supp.

663, 666 (D.D.C. 1990).  And, the alleged website does not exist.  (Rep. Akil Affidavit,

Exhibit 1 at ¶28-32).  The presence of this TRNC office, then, is only relevant should

Plaintiffs attempt to argue that the Court should assert general personal jurisdiction over

TRNC.  As TRNC demonstrates below, (*infra* at Section I.C.), however, the activities of

its office in the District of Columbia constitute interactions with the U.S. government,

and these government contacts cannot form the basis of the Court's assertion of personal

jurisdiction under the government contacts exception.

       Plaintiffs also allege that the TRNC in some manner utilizes military equipment

"obtained from the U.S.," presumably via the U.S. government located in the District of

Columbia, to interfere with their rights in property, (Compl. at ¶ 7, 36), an assertion that is undermined by the sworn statement attached by the TRNC, and by law, which prevents the TRNC from purchasing arms in the U.S.  Plaintiffs also attempt inappropriately to aggregate their allegations regarding co-defendants HSBC's provision of banking services in the District of Columbia to build a case for the TRNC's contacts with the forum.

Finally, should the Court find contacts between the TRNC and this forum such that the Court could otherwise assert personal jurisdiction over the TRNC, it would nonetheless be a violation of constitutional due process clause to hale the TRNC into this distant forum on the basis of those few contacts, as is further discussed below.  (*Infra* at Section I.D.).

    **i.  PLAINTIFFS' ALLEGATIONS REGARDING THE SALE AND MARKETING OF PROPERTIES DO NOT CONTAIN THE SPECIFIC FACTUAL ALLEGATIONS REQUIRED BY FEDERAL RULE 8(a) AND THE DISTRICT OF COLUMBIA LONG ARM STATUTE AND ARE DEMONSTRABLY FALSE**

Plaintiffs' allegations that the TRNC markets and sells properties in Cyprus are insufficiently specific, inaccurate and are easily disproved, as are Plaintiffs' allegations that the TRNC obtained arms from the U.S., presumably from the U.S. government in the District Columbia, used to interfere with Plaintiffs' property rights.  The Amended Complaint fails to allege a statutory basis that supports the Court's right to assert personal jurisdiction.  Nonetheless, as Plaintiffs invoke diversity jurisdiction; "the court's personal jurisdiction over nonresident defendants depends upon state law, here the law of the District of Columbia, the application of which is subject to the constraints of constitutional due process." *Gorman v. Ameritrade Holding Corp.*, 293 F.3d 506, 509

13

(D.C. Cir. 2002). In order to establish personal jurisdiction the Court must first examine whether jurisdiction is appropriate under the long-arm statute and whether "a finding of jurisdiction satisfies the constitutional requirements of due process." *GTE New Media Serv. Corp. v. BellSouth Corp.*, 199 F.3d 1343, 1347 (D.C. Cir. 2000). The Plaintiffs "must allege some specific facts evidencing purposeful activity by [d]efendants in the District of Columbia by which they invoked the benefits and protections of its laws." *E.g.*, *Novak-Canzeri v. Saud*, 864 F. Supp. 203, 205 (D.D.C. 1994). The Plaintiffs' burden cannot be discharged with "[m]ere conclusory statements" which "will not suffice." *Shirlington Limousine v. San Diego Union-Tribune*, 566 F. Supp. 2d 1, 3 (D.D.C. 2008) *quoting Jones v. City of Buffalo*, 901 F. Supp. 19, 21 (D.D.C. 1994). Outside evidence may be considered in the personal jurisdiction analysis. *Id.* As a result, the Court may weigh the personal jurisdiction allegations made by Plaintiffs as well as any evidence produced by the TRNC, such as Representative Akil's and Mr. Zorlu's sworn affidavits.

The question of which specific facts must be alleged is answered by the requirements of the District of Columbia Long Arm Statute. A District of Columbia court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a claim for relief arising from the person's transacting any business in the District of Columbia. D.C. Code § 13-423(a)(1); *United States v. Ferrara*, 54 F.3d 825, 828 (D.C. Cir. 1995).[6] Plaintiffs however must also "allege some specific facts evidencing

---

[6] The D.C. Long Arm statute does not contain another subsection that would support the Court's assertion of jurisdiction over the TRNC based upon Plaintiffs' allegations. The action neither arises from contracting to supply services in the District of Columbia, § 423(a)(2), nor from causing tortious injury in the District of Columbia, § 423(a)(3), (4), nor relates to real property in the District of Columbia, § 423(a)(5), nor regards a surety,

purposeful activity by [d]efendants in the District of Columbia by which they invoked the benefits and protections of its laws." *E.g.*, *Novak-Canzeri v. Saud*, 864 F. Supp. 203, 205 (D.D.C. 1994). Plaintiffs' allegations regarding the marketing and sale of properties in Cyprus must, therefore, contain specific allegations of fact that tie that alleged activity to the forum. *See* D.C. Code § 423(b) (stating "[w]hen jurisdiction over a person is based solely upon this section, only a claim for relief arising from acts enumerated in this section may be asserted against him.").

Plaintiffs' allegation regarding the marketing and sales of property—that the TRNC "actively engaged in the marketing, advertising, financing, development leasing, use or selling of properties belonging Plaintiffs and the Class", (Compl. at ¶¶ 2, 35, 45)—does not explain where such activities occur or where any specific transactions occur or to whom the properties are sold.[7] These alleged activities could be occurring in Cyprus, Turkey, continental Europe or anywhere else in the world. Plaintiffs' recently added allegations that the dispossessed property sales scheme involved "HSBC, real estate brokers and other companies located in the U.S and elsewhere." (Compl. at p.2, ¶¶ 48, 50). But allegations that merely allege that the TRNC was somehow involved with property sales in the United States or that allege money laundering, (Compl. at ¶ 48), are insufficiently specific to create personal jurisdiction over the TRNC in the District of

---

§ 423(a)(6), nor a marital or parent and child relationship, § 423(a)(7). Further, Plaintiffs cannot allege jurisdiction under D.C. Code § 13-422, which applies to "person[s] domiciled in, organized under the laws of, or maintaining his or its principal place of business in, the District of Columbia." The TRNC is a foreign government, with its capital in Lefkoşa, Cyprus. (Rep. Akil Affidavit, Exhibit 1 at ¶¶ 3-4).

[7] The TRNC notes that a related exhibit referred to in the Amended Complaint at ¶ 48 as "Exhibit A" was not included with the Amended Complaint.

Columbia under the D.C. Long Arm Statute, which requires that a cause must "arise from the acts" that occurred in the District of Columbia. D.C. Code § 13-423(b).

Plaintiffs also describe loans received by the TRNC for "financing and development based on the equity of the properties belonging to Plaintiffs" that are "directed, finalized, processed by and through HSBC and occur in whole or part in Washington, D.C. or London". (Compl. at ¶ 9). Plaintiffs also offer a vague and conclusory allegation that the TRNC conspired to commit wrongful acts "through mail, wire transactions and/or banking transactions . . . .in the District of Columbia." (Compl. at ¶ 92). These allegations however only identify HSBC activities in Washington, DC; and the TRNC can not be haled into court based upon the unilateral activities of a third party that emanate from the forum.

> Common sense and everyday experience suggest that, absent unusual circumstances, the bank on which a check is drawn is generally of little consequence to the payee and is a matter left to the discretion of the drawer. Such unilateral activity of another party or a third person is not an appropriate consideration when determining whether a defendant has sufficient contacts with a forum State to justify an assertion of jurisdiction.

*Helicopteros Nacionales de Colombia, S. A. v. Hall*, 466 U.S. 408, 417 (1984)

(footnote indicators omitted).

Plaintiffs allege only one fact among the marketing and facilitation of property sale allegations that attempts to tie their causes of action to the forum: that the "TRNC facilitates the illegal encumbrances, rental, lease use or sale of property that belongs to the Plaintiffs and the Class through a systemized process that it advertises physically in Washington DC or on the internet and recommend in counsel in their representative office in Washington, D.C. . . " (Compl. at ¶ 56). Plaintiffs however again fail to spell out the "systemized process," which is irrelevant anyway unless it occurred in the District

16

of Columbia.  Representative Akil's Affidavit makes clear that the TRNC Representative

Office in Washington, DC does not facilitate any commercial transactions.

Also, an allegation that advertising is done online in the forum does not create

personal jurisdiction over the TRNC in this forum without some specific factual

allegations regarding the content of the website and the scale of interactivity between

forum residents and the TRNC.  *See, e.g., Blumenthal v. Drudge*, 992 F. Supp. 44

(D.D.C. 1998) (holding that "the exercise of personal jurisdiction is contingent upon the

web site involving more than just the maintenance of a home page"); *Mallinckrodt v.*

*Sonus Pharmaceuticals, Inc.*, 989 F. Supp. 265 (D.D.C. 1998) (examining D.C. Code §

13-423(a)(1) and finding that an non-interactive electronic bulletin did not "constitute

transacting business within the District of Columbia for purposes of [subsection (a)(1)] of

the long-arm statute."); *Jennings v. AC Hydraulic A/S*, 383 F.3d 546, 549-50 (7th Cir.

2004) ("The exercise of personal jurisdiction based on the maintenance of a passive

website is impermissible because the defendant is not directing its business activities

toward consumers in the forum state in particular.").  Regardless, the TRNC

Representative Office *does not* presently own, control or subsidize any such website.

(Rep. Akil Affidavit, Exhibit 1 at ¶ 28-32; Zorlu Affidavit Exhibit 2).  Plaintiffs have

identified one website that they argue is connected to the TRNC in some way.  (Compl. at

¶ 59).  The facts demonstrate however that this website is not owned by the TRNC or its

Washington, DC office; the TRNC abandoned the website's domain name and ceased

any relationship to it long ago.  (Rep. Akil Affidavit, Exhibit 1 at 28-34).[8]

---

[8] Plaintiffs First Amended Complaint attached several pages from another website,
www.trncproperty.eu.  But this website has never been owned, operated, authorized by,

This leaves only the reference to that part of the "systemized process" by which the sale of property is recommended "in counsel in [the TRNC's] representative office." This, too, is an indeterminably vague statement which is not a specific fact "evidencing purposeful activity by [d]efendants in the District of Columbia by which they invoked the benefits and protections of its laws." *Novak-Canzeri v. Saud*, 864 F. Supp. at 205.  Nor is this "fact", which the TRNC disputes as discussed below, even an activity upon which Plaintiffs can base a cause of action.  In order for Plaintiffs to utilize the subsection of the long-arm statute that authorizes jurisdiction over a person who transacts business in the District of Columbia, they must "prove that . . . *the claim arose from the business transacted in the District.*" *Mallinckrodt Medical, Inc. v. Sonus Pharmaceuticals, Inc.*, 989 F. Supp. 265, 271-72 (D.D.C. 1998) *quoting Cellutech, Inc. v. Centennial Cellular Corp.*, 871 F. Supp. 46, 48 (D.D.C. 1994) (emphasis added).  The D.C. Code § 13-423(b) acts as a limit on § 13-423(a) and "bars . . . claims unrelated to the acts forming the basis for personal jurisdiction." *Dickson v. United States*, 831 F. Supp. 893, 897 n.5 (D.D.C. 1993).  This limitation is "meant to prevent 'the assertion of claims in the forum state that do not bear some relationship to the acts in the forum state relied upon to confer jurisdiction.'" *Cohane*, 385 A.2d at 158, *quoting Malinow v. Eberly*, 322 F. Supp. 594, 599 (D. Md. 1971).  Plaintiffs' allegations regarding the marketing and sale of properties in Cyprus are completely without reference to the District of Columbia, except for the single, vague reference to a process by which a recommendation is given in the representative office. (Compl. at ¶ 56).  Plaintiffs do not and cannot, (Rep. Akil Affidavit, Exhibit 1 at ¶ 23-27), explain who gives such recommendation or to which

---

or in any way affiliated with the TRNC government or its Washington, DC office. (Rep. Akil Aff., Exhibit 1 at ¶ 35).

18

properties it applies, or to any other content of the supposed recommendation; the allegation is indecipherable and incapable of supporting a cause of action against the TRNC. Plaintiffs' allegations do not meet the requirement to identify specific facts related to their causes of action, and therefore are unable to form the required prima facie case of personal jurisdiction.

Moreover, the allegation regarding the TRNC making property recommendations in its District of Columbia office is false because the TRNC representative office provides no such counseling, other than to urge those who inquire of real property purchases in the TRNC to retain their own counsel, without making attorney referrals. (Rep. Akil Affidavit, Exhibit 1 at ¶ 27). Thus, the TRNC Representative Office makes remarkably similar representations to those made by the United States government on the same issue. *See, e.g., 2009 Investment Climate Statement – Cyprus*, U.S. Department of State website, available at: http://www.state.gov/e/eeb/rls/othr/ics/2009/117430.htm (stating "Property remains one of the key outstanding issues that constitute the Cyprus problem. … Potential investors should be cautious and obtain independent legal advice concerning purchasing or leasing property in the north.", *Cyprus, Country Specific Information*, U.S. Department of State, Bureau of Consular Affairs website, available at: http://travel.state.gov/travel/cis_pa_tw/cis/cis_1098.html (reiterating that, "The absence of a political settlement and the lack of international recognition for the 'TRNC' pose an inherent risk for the foreign investor interested in buying or leasing property in north Cyprus. Prospective property buyers should always seek legal advice before buying.").

Nor may Plaintiffs base their argument for personal jurisdiction on the alleged conspiracy between HSBC and the TRNC in attempt to manufacture jurisdiction.

"[P]laintiff[s] cannot aggregate factual allegations concerning multiple defendants in order to demonstrate personal jurisdiction over any individual defendant." *Atlantigas Corp. v. Nisource, Inc.*, 290 F. Supp. 2d 34, 42 (D.D.C. 2003) *citing Rush v. Savchuk*, 444 U.S. 320, 332 (1980). For example, Plaintiffs allege that the "fraudulent scheme of the TRNC is assisted, supported or directed through HSBC and/or occurs in whole or in part in the U.S." (Compl. at ¶ 35). Not only does this particular allegation lack the required specificity by failing how or where HSBC's support of the TRNC occurs, it fails to tie any activity to the forum and even exhibits plain doubt as to whether the activity takes place in the United States. None of the alleged conspiratorial acts performed by the TRNC described by Plaintiffs in their Amended Complaint took place in the District of Columbia. Paragraphs 8, 9, 45, 46, 48, 50 in the Amended Complaint describe an alleged money laundering scheme *by HSBC* allegedly in support of the TRNC's sale of Cyprus properties through a website[9] without any specific allegations describing activity by the TRNC in the District of Columbia. "Since the 'bare allegation of conspiracy or agency is insufficient to establish personal jurisdiction[,]' 'a plaintiff must allege specific acts connecting [the] defendant with the forum [.]'" *Second Amendment Foundation v. U.S. Conference of Mayors*, 274 F.3d 521, 524 (D.C. Cir. 2001) *quoting First Chicago,* 836 F.2d at 1378.

Further, Paragraph 9 of the Amended Complaint asserts that the "TRNC has received loans for financing and development based upon the equity of the properties belonging to the Plaintiffs and the Class. These banking transactions are directed, finalized, processed by and through HSBC and occur in whole or in part in Washington

---

[9] A website that in fact the TRNC has no connection to.

DC or London." This allegation, which is typical of many in the Amended Complaint, is not only insufficiently precise as to the location of the activity—"in Washington DC or London"—as to render the allegation useless for the Plaintiffs' jurisdictional argument for the TRNC, but actually does not describe any activity by the TRNC in the forum. It only vaguely describes activities *by HSBC* in the forum, or in London. These allegations are devoid of any link to the forum, as is the alleged dispossession of real property in the northern part of the island of Cyprus, the focus of the Amended Complaint.

### ii.   PLAINTIFFS' ALLEGATIONS REGARDING MILITARY EQUIPMENT PRESUMBALY OBTAINED IN THE FORUM DO NOT CONTAIN THE SPECIFIC FACTUAL ALLEGATIONS REQUIRED BY FEDERAL RULE 8(a) AND THE DISTRICT OF COLUMBIA LONG ARM STATUTE AND ARE DEMONSTRABLY FALSE

The only remaining argument that Plaintiffs could assert toward the assertion of specific personal jurisdiction case must be based upon the vague references in the Amended Complaint regarding TRNC's use of U.S. military equipment. Plaintiffs allege the TRNC, with "weapons equipment and arms obtained from the U.S." interferes with rights in property belonging to Plaintiffs and the Class. (Compl. at ¶¶ 7, 36). This allegation is irrelevant to Plaintiffs case of personal jurisdiction in the forum because they do not specify who obtained the equipment, how the equipment was obtained or even where in the United States any of the "obtaining" occurred. In any event, the TRNC cannot obtain arms from the United States as the United States explicitly forbids commercial military exports to any armed force on Cyprus other than the United Nations Peacekeeping Force in Cyprus ("UNFICYP"). Department of State Denial Notice, 57 C.F.R. 60265 (explaining that, "The U.S. Government opposes of such exports because

of their ability ... to hinder U.S. and U.N. efforts to reach a fair and permanent settlement

of the Cyprus dispute."). Moreover, the TRNC has never obtained arms from the United

States. (Rep. Akil Aff., Exhibit 1 at ¶ 35). "My understanding is that U.S. law would

forbid exports of military equipment to either of the Cypriot communities." Because, the

D.C. Long Arm Statute requires that a cause of action be based upon a jurisdictional tie to

the forum and there are no jurisdictional allegations linking the TRNC's alleged use of

U.S. military equipment to the forum; the Court does not have personal jurisdiction over

the TRNC for any causes of action related to the demonstrably false allegation regarding

the purchase of military equipment in the District.

### C. PLAINTIFFS' AMENDED COMPLAINT FAILS TO ALLEGE FACTS UPON WHICH THE COURT MAY ASSERT GENERAL PERSONAL JURISDICTION BECAUSE THE TRNC REPRESENTATIVE OFFICE'S CONTACTS WITH THE U.S. GOVERNMENT ARE EXCLUDED FROM CONSIDERATION UNDER THE GOVERNMENT CONTACTS EXCEPTION

The range of the TRNC's contacts with the forum described in Plaintiffs'

Amended Complaint that are unrelated to their causes of action but which could arguably

support a case for general personal jurisdiction are either excluded from analysis by the

government contacts exception, or are insufficient to meet the "continuous and

systematic" standard. General jurisdiction may exist over a foreign corporation for

claims that do not arise from the corporation's conduct within the District, if the

corporation is "doing business" in the District and its business contacts are "continuous

and systematic." *Gorman v. Ameritrade Holding Corp.*, 293 F.3d 506, 509-10 (D.C. Cir.

2002) (internal citations omitted).

An exception to this rule however is found in the government contacts exception.

As developed by the courts of the District of Columbia, the government contacts

exception provides that "entry into the District of Columbia by nonresidents for the

purpose of contacting federal governmental agencies is not a basis for the assertion of in

personam jurisdiction." *Environmental Research Int'l, Inc. v. Lockwood Greene Eng'rs,*

*Inc.*, 355 A.2d 808, 813 (D.C. 1976) (en banc). The rationale for this exception finds its

source in the unique character of the District of Columbia as the seat of national

government and in the correlative need for unfettered access to federal departments and

agencies. To permit courts in the District of Columbia to assert personal jurisdiction over

nonresidents whose sole contact with the District consists of dealing with a federal

instrumentality not only would pose a threat to free public participation in government,

but also would threaten to convert the District of Columbia into a national judicial forum.

*Id., Naartex Consulting Corp. v. Watt*, 722 F.2d 779, 787 (D.C. Cir. 1983) (holding that

the defendant's contacts with the Interior Department in negotiations for a lease

agreement were excluded by the government contacts principle); *Zeneca Ltd. v. Mylan*

*Pharmaceuticals, Inc.*, 173 F.3d 829 (Fed. Cir. 1999); *Cellutech, Inc. v. Centennial*

*Cellular Corp.*, 871 F. Supp. 46, 50 (D.D.C. 1994) (applying the government contacts

exception to exclude contacts with federal government from due process analysis);

*Investment Co. Inst. v. United States*, 550 F. Supp. 1213, 1216 (D.D.C. 1982) (excluding

those business activities that involved the provision of information to or receipt of

information to the government from the Court's weighing of contacts relevant to personal

jurisdiction); *Savage v. Bioport*, Inc., 460 F. Supp. 2d 55, 62 (D.D.C. 2006) (holding that

the nonresident defendant's contacts with Department of Defense were made in an

attempt to influence government action; therefore, its contacts were excluded by the

government contacts principle from establishing jurisdiction).[10]  The government

contacts exception covers contacts with all three branches of the federal government,

including federal agencies.  *See Mallinckrodt Med. v. Sonus Pharmaceuticals*, 989 F.

Supp. 265, 271 (D.D.C. 1998); *Brunson v. Kalil & Co.*, 404 F. Supp. 2d 221, 236 (D.D.C.

2005).

The TRNC's presence in Washington, D.C. falls under the government contacts

exception.  Its contacts here are associated with interacting with the United States

government, including such activities as monitoring Congressional action that may

concern northern Cyprus and arranging or holding meetings with Department of State or

Administration personnel and their staff and Members of Congress or their staff.  (Rep.

Akil Affidavit, Exhibit 1 at ¶¶ 16, 19, 23).  The TRNC maintains an office in

Washington, D.C. entitled, "Representative Office of the Turkish Republic of Northern

---

[10] Two years after *Environmental Research* the District of Columbia Court of Appeals
attempted to narrow the exception on First Amendment grounds.  *See Rose v. Silver*, 394
A.2d 1368, 1374 (D.C. 1978).  But as explained in *Zeneca, supra*:

> Many federal courts sitting in the District of Columbia, however, have
> adopted the broad interpretation of the exception as espoused in
> *Environmental Research* and have noted that the *Rose* panel could not
> overrule the en banc decision in *Environmental Research. See Naartex
> Consulting Corp. v. Watt*, 722 F.2d 779, 786 (D.C. Cir. 1983) (explaining that
> the Rose panel opinion cannot overrule the en banc decision in *Environmental
> Research* and expressing hesitancy towards adopting the Rose approach). For
> example, in *Investment Co.*, the court explained: The federal cases from this
> circuit applying the government contacts principle in their respective
> circumstances, however, have not spoken in traditional First Amendment
> terms in doing so. They have simply discounted the defendants' business
> activities in the District by the amount they involved getting information from
> or giving information to the government, or getting the government's
> permission to do something, which can only be done in Washington because
> that is where the government is.

*Zeneca*, 173 F.3d at 831-832.

24

Cyprus." All of the office's employees serve to contact directly members of the U.S.

government and to monitor U.S. governmental action that may impact the TRNC. (Rep.

Akil Affidavit, Exhibit 1 at ¶ 19). All expenditures, detailed in the office's foreign agent

registration reports filed with the Department of Justice, demonstrate their unambiguous

relationship to this end. (Rep. Akil Affidavit, Exhibit 1 at ¶ 19, FARA Reports, Exhibit

5). The office is headed by Mr. Hilmi Akil who was dispatched to this office by his

government. (Rep. Akil Affidavit, Exhibit 1 at ¶ 19). Shortly after his arrival, the U.S.

State Department provided a letter to Mr, Akil, acknowledging his purposes in the United

States. (Exhibit 3). The State Department, refers to Mr. Akil as, "a person favorably

known to the Department of State in his capacity as a foreign lobbyist and as formal

representative of the Turkish Cypriot community in Washington D.C."[11]  *Id.* The

Department of State acknowledges that Mr. Akil files as a foreign agent and that, "he

interacts with the Department of State officials on a regular, long-term basis." *Id.*

Commenting on his role as representative of his community on Cyprus, the letter restates

U.S. policy, which is grounded in acknowledging the two Cypriot communities: "[t]he

United States' overarching objective on Cyprus is to help foster a comprehensive

settlement that reunifies the island into a bi-zonal, bi-communal federation between the

Greek Cypriot and Turkish Cypriot communities." *Id. See*, July 7, 2008 Statement of

Assistant Secretary of State Daniel Fried, (stating "We support a bizonal, bicommunal

federation," available at: http://nicosia.usembassy.gov/USpolicy/sp-

---

[11] As indicated in the third paragraph of this letter, the term "Turkish Cypriot
community" refers to the ethnically Turkish residents on the island of Cyprus, not those
Turkish Cypriots in the Washington, D.C. area, of which there are very few. Mr. Akil, is
thus the Washington representative of one of the two ethnic communities on the island of
Cyprus.

ASFriedTranscJul08.htm (last visited February 10, 2010) and U.N. Security Council

Resolution 1898 (2009) (reiterating "the Secretary-General's firm belief that the

responsibility for finding a solution lies first and foremost with the Cypriots themselves,

.. [and that the goal is] to reach a comprehensive settlement based on a bicommunal,

bizonal federation with political equality….").

 Mr. Akil's purposes, then, are to work with and educate members of the U.S.

government, primarily in the executive branch, but also in the legislative branch, (Rep.

Akil Affidavit, Exhibit 1 at ¶ 16), to achieve the very same end that the United States is

seeking. These efforts are exemplified in the two most recent foreign agent registration

statements filed by Mr. Akil with the U.S. Department of Justice. (FARA Reports,

Exhibit 5). Neither the TRNC nor its Representative Office engages in commercial

relations with the U.S. government nor do they solicit funds from the U.S. government.

(Rep. Akil Affidavit, Exhibit 1 at ¶ 16). *Cf. Ramamurti v. Rolls-Royce, Ltd.*, 454 F.

Supp. 407, 411 (D.D.C. 1978) (describing defendant's activities in the District as

"substantial commercial relations with the federal government acting in its proprietary

capacity," and on this basis finding personal jurisdiction). Because the TRNC's contacts

with the federal government are not commercial in character, they ought to be excluded.

*Hughes v. A.H. Robins*, 490 A.2d 1140, 1145 n.4 (D.C. 1985); *Crane*, 814 F.2d at 761.

*Hughes* addressed an instance in which a defendant maintained an office in the District of

Columbia "for the purpose of monitoring congressional legislation affecting [its]

industry. 490 A.2d at 1143. The court determined that "those activities which are

conducted here solely for the purpose of gathering information from the federal

government are not 'contacts' within the meaning of *International Shoe* and its progeny."

If Plaintiffs are able to force the Court to adjudicate a dispute among non-residents over land in Cyprus based upon the presence of the TRNC's governmental relations office, than the District of Columbia would come one step closer to becoming a catch-all international litigation forum.

> **D.   SHOULD THE COURT FIND THAT SUFFICIENT MINIMUM CONTACTS EXIST, THE ASSERTION OF PERSONAL JURISDICTION WOULD NONETHELESS OFFEND THE CONSTITUTIONAL GUARANTEE OF DUE PROCESS**

The TRNC never could have reasonably foreseen that it might be sued in the District of Columbia by fellow non-residents over a dispute over land on the island of Cyprus. Even if the Court finds that the TRNC has sufficient contacts in the forum, the Court should decline to exercise jurisdiction as the assertion of jurisdiction would not comport with constitutional standards of "fair play and substantial justice." It is fair and reasonable for a defendant to anticipate being sued in the District if the defendant has "purposefully availed itself of the benefits and protections of the District in engaging in a business activity in the forum". *Shoppers Food Warehouse v. Moreno*, 746 A.2d 320, 329 (D.C. 2000) *citing Burger King v. Rudzewicz*, 471 U.S. 462, 472 (1985). If a defendant "manifestly has availed himself of the privilege of conducting business" in the forum, and "because his activities are shielded by 'the benefits and protections' of the forum's laws it is presumptively not unreasonable to require him to submit to the burdens of litigation in that forum as well." *Burger King*, 471 U.S. at 476. The focus is placed on "the relationship among the defendant, the forum and the litigation" and it is fair to assert specific personal jurisdiction where a defendant "has purposefully directed its activities at District residents, and claims against it by a District resident" and the claims arise out of those activities. *Id.* The District has a "manifest interest in providing a convenient forum

27

in which its residents may seek relief for injuries inflicted by the nonresident defendant, especially where litigation within the District would not impose an undue burden on the nonresident defendant." *Id.*

But in this case, excluding the demonstrably false allegation of TRNC military purchases in the District of Columbia and the incoherent and conclusory insinuation regarding "counseling", the litigation is based upon alleged activities that have taken place on the island of Cyprus. None of the Plaintiffs are District of Columbia residents and Plaintiffs' Amended Complaint is devoid of any explanation as to how the TRNC directed its activities to any residents of the District of Columbia or purposefully availed itself of the benefits and protections of the forum's laws. When the Court focuses upon "the relationship among the defendant, the forum and the litigation" it can only come to the conclusion that it is unreasonable to exercise personal jurisdiction over the TRNC in this forum for a lawsuit concerning land disputes on Cyprus.

Furthermore, land claims litigation alleging identical or near-identical facts is currently ongoing in the domestic courts of southern Cyprus, at the European Court of Human Rights in Strasbourg, France, and at the Immoveable Properties Commission in Lefkoşa northern Cyprus. (Rep. Akil Affidavit, Exhibit 1 at ¶ 35-40; Defendant's Counterstatement of Facts at p.17-21). Greek Cypriots have been able to obtain relief of the nature requested by Plaintiffs in all of these tribunals.[12] (Rep. Akil Affidavit, Exhibit

---

[12] The damage awards in such fora however have been orders of magnitude lower than the preposterous sum, $400 billion, requested by Plaintiffs. The nonpartisan International Peace Research Institute in Oslo, Norway, which has extensively studied the property regime on Cyprus, estimates that solving all real property compensation claims on the island would take an estimated €15 billion, or about $20.5 billion, which is approximately five percent of what the Plaintiffs have requested. *See* Praxoula Antoniadou Kyriacou, Özlem Oğuz and Fiona Mullen, *Reconstructing a Reunited*

28

l at ¶ 36, 39). Plaintiffs thus have avenues of relief on the island of Cyprus and within

the European Union, of which they are citizens. Further, none of those jurisdictions and

fora have precluded land claims litigation stemming from the division of Cyprus on the

basis of a statute of limitations. By contrast, when this Court considered a similar matter,

it did find that the District of Columbia's statute of limitations precluded such claims. *See*

*Crist et al, v. Republic of Turkey*, 995 F. Supp. 5 (D.D.C. 1998) (dismissing the

complaint as time-barred on May 12, 1995 in Judge Lamberth's original order; case later

dismissed on basis of subject matter jurisdiction). The District of Columbia does not

have a manifest interest in the resolution of this case and it is not fair or reasonable to

subject the TRNC to the burden of litigating in a distant forum these questions, in which

the District has little interest.

Any contacts for Plaintiffs' general jurisdiction case must pass through an

additional constitutional filter prior to the Court's assertion of personal jurisdiction.

Whatever contacts that arise from the TRNC's use of an office in the District that are not

precluded from analysis as a result of the government contacts exception must also form

a "continuous and systematic" pattern of contacts with the forum. A case of general

personal jurisdiction must "meet the heavy burden of showing that the defendant's

contacts with the forum are sufficiently continuous and systematic to warrant an exercise

of general personal jurisdiction over a foreign defendant." *Miller v. Holzmann*, CA No.

---

*Cyprus,* January 2009, available at: http://www.prio.no/upload/The%20day%20after-2%20ENG-web.pdf. Moreover, the Amended Complaint at ¶ 12 indicates the possibility
that there may be approximately 170,000 claimants. Applying this figure to the requested
damage award requested by Plaintiffs would yield the figure that each claim in Cyprus
could be worth an average of $2.35 million, also a preposterous sum that would make
northern Cyprus property more valuable than that in Hong Kong or Monte Carlo.

95-1231(RCL), 2007 WL 778568, *2 (D.D.C. March 6, 2007) *citing Perkins Benguet Consol. Min. Co.,* 342 U.S. 437 (1952). The application of the government contacts exception however effectively precludes the Court's relying on the contacts associated with the use of an office in the forum. The remaining contacts are simply absent. Thus, the TRNC's contacts with the forum do not meet the heavy "continuous and systematic" constitutional burden required prior to allowing the Court to assert personal jurisdiction over a defendant based upon activity unrelated to the alleged activities that form the gravamen of a complaint.

## II.   PLAINTIFFS DO NOT PLEAD SUFFICIENT ACITIVITES PERFORMED BY THE TRNC IN THIS FORUM SUCH THAT VENUE MIGHT LIE HERE

Under Rule 12(b)(3) of the Federal Rules of Civil Procedure, a defendant may move to dismiss a plaintiff's complaint for improper venue in lieu of filing an answer. When a defendant challenges venue, the plaintiff bears the burden of establishing that venue is proper, "[b]ecause it is the plaintiff's obligation to institute the action in a permissible forum." *Freeman v. Fallin*, 254 F. Supp. 2d 52, 56 (D.D.C. 2003). In considering a motion to dismiss for improper venue, the Court must accept the plaintiff's well-pled factual allegations regarding venue as true, must "draw all reasonable inferences from those allegations in the plaintiff's favor, and must resolve any factual conflicts regarding venue for the plaintiff. *See Quarles v. Gen. Inv. & Dev. Co.*, 260 F. Supp. 2d 1, 8 (D.D.C. 2003), citing *James v. Booz-Allen, Hamilton, Inc.*, 227 F. Supp. 2d 16, 20 (D.D.C. 2002); *2215 Fifth St. Assocs. v. U-Haul Int'l, Inc.*, 148 F. Supp. 2d 50, 54 (D.D.C. 2001). If the Court finds that venue is improper, it must dismiss the action or, "if it be in the interest of justice," the Court may transfer the action "to any district or division in which it could have been brought." 28 U.S.C. § 1406(a). The decision whether

to dismiss the action or transfer it is committed to the "sound discretion" of the district court. *Naartex Consulting Corp. v. Watt*, 722 F.2d 779, 789 (D.C. Cir. 1983). Plaintiffs allege that venue is proper under 28 U.S.C. § 1391 "because Defendants' commercial acts or omissions giving rise to this action substantially or materially occurred in the District of Columbia and Defendants maintain offices and transact business in the District of Columbia related to Plaintiffs' claims." (Compl. at ¶ 3). The TRNC has demonstrated that it has not engaged in any commercial acts in this forum, certainly not any that could be tied to the causes of action alleged in the Amended Complaint. *Supra*, at p.10-21.

The deficiency in Plaintiffs' personal jurisdiction allegations and the TRNC's counter proof also demonstrate that venue can not rest upon the presence of the TRNC's Representative Office in the District. A defendant's contacts for the express purpose of interacting with the U.S. government cannot "constitute jurisdiction (and correspondingly venue) because the government contacts doctrine 'precludes the assertion of personal jurisdiction over a non-resident whose only contact with the District of Columbia is with Congress or a federal agency.'" *Kazenercom TOO v. Turan Petroleum, Inc.*, 590 F.Supp.2d 153, 162 (D.D.C. 2008).

And finally, excluding the present case from venue in the District of Columbia would not leave the Plaintiffs without an available forum for relief for, as this memorandum and the attached exhibits demonstrate, alternate fora exist to pursue legal remedies outside of the District of Columbia.

### III.     THE CLAIMS OF MICHALI TOUMZOU SHOULD BE DISMISSED DUE PLAINTIFFS' VIOLATION OF LOCAL RULE 5.1(e)

Plaintiff's original and amended complaints in their captions and in their text, (Compl. at ¶4), state that Plaintiff Michali Toumazou is "a resident of North Carolina," but Mr. Toumazou's full residence address has never been provided as required by Local Rule 5.1(e): "[t]he first filing by or on behalf of a party shall have in the caption the name and full residence address of the party." Plaintiffs provide only a post office box. Local Rule 5.1(e), allows 30 days to cure such an error, but this time has long expired. Indeed, though Plaintiffs have amply taken the opportunity to file successive amendments of their original complaint, filed on October 19, 2009, some 159 days ago, they have not bothered to provide a residence address for Mr. Toumazou. The rule states that "[f]ailure to provide the address information within 30 days upon filing may result in the dismissal of the case against the defendant." The dismissal of the claims of a single plaintiff in this matter ought not cause excessive lament given that the Amended Complaint alleges the possibility that as many as 170,000 individuals may have similar claims and seeks to certify a class. (Compl. at ¶¶ 12, 76). But a violation of Local Rule 5(e) is more a matter of substance than form: where a party resides can be critical to a court's consideration of both subject matter and personal jurisdiction. Plaintiffs' error here, which has persisted despite numerous opportunities to cure, should not be rewarded and Mr. Toumazou's claims should be dismissed.

### CONCLUSION

Sweeping aside the clutter of the Amended Complaint's inflammatory rhetoric and self-serving suppositions, an examination of the its personal jurisdiction allegations

reveals that the contacts regarding the marketing and sale of properties in northern Cyprus lack sufficiently specific detail to meet the pleading requirements of Fed. R. Civ. P. 8(a). Furthermore, Plaintiffs failed to submit concrete evidence of personal jurisdiction required by Rule 8, which does not require the Court to rely upon Plaintiffs' allegations as true. Instead Rule 8 requires the Court to examine evidence submitted by the TRNC. This evidence further disproves Plaintiffs' claims of the TRNC's commercial intercourse through a website that the TRNC does not own and the TRNC's purchase of military equipment from the U.S.

If the Court finds contacts by the TRNC with the forum, an assertion of personal jurisdiction would not comport with the constitutional standards of "fair play and substantial justice."

Plaintiffs' conclusory allegations do not meet the requirement of Rule 8(a); therefore their Amended Complaint should be dismissed for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2) and lack of venue pursuant to Fed. R. Civ. P. 12(b)(3). Further, the Court should dismiss the claims of Michali Toumazou pursuant to Local Rule 5.1(e).

Dated March 26, 2010                    Respectfully submitted,

**/s/ Steven R. Perles**                **/s/ David S. Saltzman**
Steven R. Perles (No. 326975)           David S. Saltzman (No. 436201)
Edward MacAllister (No. 494558)         SALTZMAN & EVINCH, PC
PERLES LAW FIRM, PC                     655 15th Street, N.W.
1146 19th Street, NW                    Suite 225-F
5th Floor                               Washington, DC 20005
Washington, DC 20036                    Telephone: (202) 637-9877
Telephone: (202) 955-9055               Telefax: (202) 637-9876
Telefax: (202) 955-3806

Attorneys for Defendant
Turkish Republic of Northern Cyprus

33

# EXHIBIT 1

UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Toumazou,<br>et al.,<br><br>Plaintiffs,<br><br>v.<br><br><br><br>Turkish Republic of Northern Cyprus<br>et al.<br><br>Defendants. | )<br>)<br>)<br>)   Civil Action No. 09-1967<br>)   Judge Paul L. Freidman<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## <u>AFFIDAVIT OF MR. HILMI AKIL</u>

MR. HILMI AKIL, under penalty of perjury hereby affirms:

1.     I am the Washington, D.C. Representative of the government of the

Turkish Republic of Northern Cyprus (the "TRNC"), defendant in the above-captioned

matter.  I submit this affidavit in support of pleadings filed with the Court seeking the

dismissal of the TRNC from this lawsuit.  Except as expressly indicated to the contrary, I

have personal knowledge of the facts set forth herein.  I have also reviewed the Motion to

Dismiss and supporting memoranda and exhibits and hereby declare that all factual

matters therein are true and correct to the best of my knowledge, information and belief.

2.     My residence in the United States is at 5401 Westbard Avenue in

Bethesda, Maryland.

<u>Functioning of the TRNC:</u>

1

3.      The TRNC governs that part of the island of Cyprus north of the United Nations controlled Green Line.  The TRNC was declared on November 15, 1983, with its capital in Lefkoşa, the Turkish Cypriot sector of Nicosia.  It is the successor government to the Turkish Federated State of Cyprus, which was founded in 1975 following the armed conflict on the island that resulted in the formal separation of the two Cypriot communities, with Turkish Cypriots living on roughly the island's northern third and Greek Cypriots living on roughly its southern two-thirds.  This separation of the two communities has been the status quo for more than 35 years, although there is a vigorous and ongoing effort aimed at unifying the island supported and facilitated by the United States, the United Nations and the European Union.

4.      The TRNC is governed as a democratic republic.  Our President is the head of state, our Prime Minister the head of the government.  Our legislature is composed of 50 members proportionally representing five electoral districts.  The TRNC judiciary is independent of the other branches of government.  The next presidential election will be on April 18, 2010.  Parliamentary elections were most recently held on April 19, 2009.  The location and mailing address of the TRNC government is: Turkish Republic of Northern Cyprus Prime Ministry, Selcuklu Caddesi, Lefkoşa-KKTC.  Freedom House, an independent watchdog organization that advocates for democracy and human rights, rates the TRNC as "Free."  (Freedom House Country Report on Northern Cyprus, http://www.freedomhouse.org/template.cfm?page=22&country=7754&year=2009).

5.      Though the TRNC is formally recognized as a sovereign state only by the Republic of Turkey, the TRNC's President, Mehmet Ali Talat, regularly meets with high

government officials and leaders of numerous foreign states, among them, current U.S. Secretary of State Hillary Clinton (April 15, 2009) then U.S. Secretary of State Condoleezza Rice (October 28, 2005), then U.S. Secretary of State Colin Powell (May 4, 2004, when Mr. Talat was Prime Minister), current U.N. Secretary General Ban Ki-moon (February 1, 2010, September 28, 2009, March 13, 2008, and October 16, 2007), then U.N. Secretary General Kofi Annan (November 22, 2006), European Commission President Jose Manuel Barroso (January 6, 2010 and January 25, 2009), President of the European Parliament Jerzy Buzek (February 4, 2010), European Union Commissioner on Enlargement Ollie Rehn (February 13, 2009 and November 5, 2009), then Secretary-General of the Council of Europe Terry Davis (September 30, 2008), British Prime Minister Gordon Brown (December 4, 2009), British Foreign Minister David Miliband (September 23, 2009), then British Foreign Minister Jack Straw (January 25, 2006), Italian Foreign Minister Franco Frattini (February 17, 2010), Spanish Foreign Minister Miguel Angel Moratinos (February 27, 2010, September 26, 2009), Swedish Foreign Minister Frank Belfrage (October 1, 2008), and then President of Pakistan Pervez Musharraf (September 4, 2009). President Talat has also met with other members of the U.S. State Department, including the Assistant Secretary of State and the U.S. Ambassador to Cyprus, as well as with Members of the U.S. Congress, both on Cyprus and in Washington. Additionally, President Talat is in periodic telephonic contact with these officials and others. And, as the TRNC is recognized by Turkey, Turkish Cypriot elected and appointed leaders meet on a regular basis with their counterparts in Turkey.

6. Elected Turkish Cypriot representatives participate in the Parliamentary Assembly of the Council of Europe pursuant to the Assembly's Resolution 1376 of April

3

29, 2004. (Available at

http://assembly.coe.int/main.asp?Link=/documents/adoptedtext/ta04/eres1376.htm).

And, the TRNC, under the name, "The Turkish Cypriot State" is an observer member of

the Organization of the Islamic Conference.

7.     Negotiations between the Turkish Cypriot and Greek Cypriot communities

toward unification under a federal entity have been proceeding on a nearly continuous

basis since 1975, and are continuing today. A major milestone in those negotiations

occurred on April 24, 2004 when, with the approval of their respective leaders, Turkish

Cypriots and Greek Cypriots were presented a United Nations-sponsored plan that would

have united the island under a federal state composed of two constituent states, one

Turkish Cypriot and one Greek Cypriot. If approved by dual referenda, the unified entity

would have entered the European Union. The Turkish Cypriots voted to approve the

plan, with 65 percent in favor. The Greek Cypriots voted to reject the plan, with only 24

percent in favor. Thus, the plan failed. The current round of negotiations between

President Talat on behalf of the Turkish Cypriot community and President Christofias on

behalf of the Greek Cypriot community has been ongoing for 18 months. The two

leaders have met more than sixty times during this period.

8.     Despite the failure of the United Nations-sponsored referenda, as of May

1, 2004 the European Union ("E.U.") has considered the whole island of Cyprus part of

the E.U. E.U. legislation is deemed "suspended" in the TRNC, though the E.U. considers

Turkish Cypriots E.U. citizens. (Website of the European Commission in Cyprus,

http://ec.europa.eu/cyprus/turkish_community/index_en.htm). The E.U. approved €259

4

million, or approximately $360 million, in aid to the Turkish Cypriot community on February 27, 2006. *Id.*

9.      Leaders of both Cypriot communities, the United Nations Secretary General, the European Union Commission on Enlargement, and most commentators have stated that a workable solution to the numerous property claims is essential to finding a durable political settlement on the island and, therefore, it remains one of the central issues in negotiations.  As stated in the May 27, 2005 "Report of the Secretary-General on the United Nations operation in Cyprus", (U.N. Doc. S/2005/353) (emphasis added), **"The prospect of an increase of litigation in property cases on either side poses a serious threat to people-to-people relationships and to the reconciliation process.** Property rights continue to be an extremely sensitive issue on both sides and it is widely believed that **only a comprehensive settlement of the Cyprus problem can bring closure to the property issue**."  Commenting on a recent decision of the European Court of Human Rights dismissing several Greek Cypriot property claims, on March 10, 2010, the Greek Cypriot President Christofias declared, "[**T**]**he property issue, as well as other aspects of the Cyprus problem, will be solved at the negotiating table**." (Available at

http://www.presidency.gov.cy/presidency/presidency.nsf/257dd326cd3d2743c225751500 33e6a7/385cd348a973abd0c22576f0002157d2?OpenDocument.)  And in a press briefing on June 26, 2009, European Union Commissioner on Enlargement, Ollie Rehn, similarly declared, "[t]he Commission considers that a sustainable solution to the property issues in Cyprus can only be reached through a comprehensive settlement of the Cyprus problem."

5

(Available at http://www.europarl.europa.eu/sides/getAllAnswers.do?reference=E-2009-3523&language=EN).

My Employment and Visa:

10.     I am employed by the TRNC Ministry of Foreign Affairs.  My government dispatched me to Washington, D.C. in January 2007 to serve as the TRNC's Washington D.C. Representative.

11.     I traveled to the United States using a diplomatic passport issued by my government.  As the United States does not acknowledge the TRNC's sovereign status, it does not recognize my passport; however, prior to my arrival, the United States issued me a visa, a photocopy of which I have made available to my counsel for attachment to the TRNC's pleadings as necessary.  (Exhibit 3).  My understanding is that the United States' granting of my one-year B1/B2 visa and its extensions through five years is unusual and reflective of the courtesy extended to the TRNC by the United States.

12.     My visa refers to me as "Representative of TRNC in Washington, D.C." (Exhibit 3).

13.     Upon my arrival the United States Department of State also provided a letter for the purpose of facilitating my activities in the United States.  (Exhibit 4).  The letter acknowledges:  (a) my status as the formal and official representative of the Turkish Cypriot community, and that I am favorably known to the Department of State in this capacity, (b) that my purpose in the United States is to be the official representative of the Turkish Cypriots, (c) my registration with the Department of Justice as a foreign agent, (d) that I "interact[] with Department of State officials on a regular, long-term basis," (e)

6

that the United States has regularly extended visas for persons in my position for up to five years, and (f) that the "United States' overarching objective on Cyprus is to help foster a comprehensive settlement that reunifies the island into a bi-zonal, bi-communal federation between the Greek Cypriot and Turkish Cypriot communities."

14.     Similar letters were provided to the two members of my staff who are also direct employees of the TRNC Ministry of Foreign Affairs and who carry TRNC diplomatic passports.

TRNC Representative Office Purposes and Activities:

15.     The TRNC Representative Office in Washington, DC exists to interact with the United States federal government.  This interaction takes two primary forms: gathering information on legislation and U.S. policies that may impact the Turkish Cypriot people and informing the U.S. government of my government's position and opinions vis-à-vis such legislation and policies.

16.     I do not hold myself out as an ambassador in the United States in general or to officials of the United States government.  I am registered as a foreign agent with the United States Department of Justice pursuant to the Foreign Agents Registration Act of 1938.  The information that I disseminate, copies of which my office files with the Department of Justice, is marked "TRNC Washington Office."  Correspondence from my office is made under letterhead entitled "Turkish Republic of Northern Cyprus, Washington Office."  I sign such correspondence as "Hilmi Akil, Representative, Turkish Republic of Northern Cyprus."

17.     The above notwithstanding, I do employ the title of Ambassador when presenting myself to officials of the Republic of Turkey, a sovereign state that recognizes the TRNC. And, the TRNC maintains an embassy in Ankara, as well as three consulates in Turkey to tend to the requirements of Turkish Cypriots living there.

18.     In addition to me, the Representative Office includes four other individuals. Two are TRNC nationals and direct employees of the TRNC Ministry of Foreign Affairs. Each has been issued a visa by the United States government describing him and her as an, "Official in Representative Office of TRNC in Wash. D.C." Each was provided a letter similar to that which I received following my arrival and described above. Another member of my staff is a Turkish national who resides in Maryland as a permanent resident alien. She is employed as an independent contractor. The staff's function is to assist me in my contacts with members of the United States government. The office also has hired a driver, who is an independent contractor. He is an American citizen and a resident of Virginia. All of the above is noted in my foreign agent registration reports to the Department of Justice.

19.     The TRNC Representative Office occupies leased premises at 1667 K Street, NW, Washington, DC. It is a small office of approximately 1,250 square feet. On its door is plainly written, "Office of the Turkish Republic of Northern Cyprus".

20.     Neither this office nor the government of the TRNC has ever purchased, contracted to purchase in the District of Columbia or has otherwise obtained from the United States military equipment. My understanding is that U.S. law would forbid exports of military equipment to either of the Cypriot communities.

8

21.     Neither the TRNC nor the TRNC Representative Office derive
commercial income of any kind from its activities in Washington, D.C., which consist of
interacting with the United States government in a political, not commercial manner.

22.     Neither the TRNC Representative Office nor I, in my official capacity,
advertise, finance, or sell properties in the TRNC.  Nor do we in any way assist in such
matters.  Neither my staff nor I recommend or counsel regarding private property
transactions in the TRNC.  Nor have we enlisted the aid of REMAX or HSBC in any of
these activities, in which we do not engage.

23.     Neither the TRNC Representative Office nor I, in my official capacity,
solicit or obtain funds for advertising, marketing, financing, selling or transferring
properties in the TRNC.

24.     Neither the TRNC Representative Office nor I, in my official capacity,
facilitate the sale of any property in the TRNC via the internet or by any other method.

25.     The number of visitors to our office who make general inquiries about the
TRNC is very small, and does not exceed a handful per year.  Should a visitor to our
office inquire about purchasing property in the TRNC, I or a member of my staff advise
him or her to hire his or her own attorney to assist in the process.  This office does not
provide referrals to attorneys.  The office does make maps of the TRNC available to
visitors and keeps several northern Cyprus related tourism magazines on the coffee table
in the office's reception area.

26.     Neither I nor any member of my staff has ever been indicted or charged
with a crime in the United States for any of our acts on behalf of the TRNC.  And neither

this office nor the TRNC engages in criminal activities, and certainly not in any conspiracy to commit terrorism against the United States, as is alleged by the Plaintiffs without any basis or justification in their Amended Complaint.

27.     The TRNC is not subject to enhanced money laundering scrutiny by the United States Financial Crimes Enforcement Network ("FinCEN"). On July 23, 2009, the U.S. Department of the Treasury issued Advisory FIN-2009-A005, which supersedes and withdraws the previous advisory (FIN-2008-A003) that was referred to in paragraph 48 of Plaintiffs' Amended Complaint. FinCEN's latest notice states that the U.S. Financial Action Task Force "welcomed the significant progress made in the northern part of Cyprus and noted that it had substantially addressed the anti-money laundering/counter financing of terrorism (AML/CFT) deficiencies that FATF had identified." For that reason, the earlier Advisory "regarding the area of Cyprus administered by Turkish Cypriots (northern part of Cyprus), is hereby withdrawn." Advisory FIN-2009-A005 is attached for your reference. (Exhibit 6).

The TRNC Representative Office Does Not Operate or Own a Website:

28.     This office established a website, with the domain name, "www.trncwashdc.org" in November 1996. The registrant was a local individual, Mr. Erol Güven of Turquoise Technologies Corp whose addresses were 8700 Georgia Avenue, Silver Spring, Maryland 20910 and P.O. Box 5282, Laurel, Maryland 20726 during the period that our office contracted with him. In 2002, we were alerted that Turquoise Technologies Corp. changed its name and address to Preference Corporation, with an address of 6731 Reisterstown Road, Baltimore, Maryland 21215.

29.     This website contained headings on "News," "General Information," "History," "Government," "Culture & Science," "Travel & Tourism," "Business & Economy," "Geography," "Contact Information," and an "Index." I have reviewed a sampling of archived copies of the website's content and none of these appear to have provided any information regarding private real estate purchases in the TRNC under any heading. And, as a government-sponsored website, such advertising would have been disallowed. I know of no TRNC government sponsored website that authorizes commercial advertising.

30.     In May 2000 the website, "www.trncwashdc.org," was hacked on the internet so that visitors were automatically redirected to a dummy website bearing belligerent, anti-Turkish slogans. The dummy website included a proud admission that it was the product of a hacking operation. An investigation was commenced that led to an internet address registered in the Greek part of Cyprus. As a precaution, this office then transferred the site to a different web hosting service provider via Network Solutions, Inc. of Baltimore, Maryland. On November 8, 2005 we ceased making payments to the web hosting service provider. As a result, we voluntarily forfeited all rights to the domain name, "www.trncwashdc.org". The current website at this address, which apparently contains advertising for real estate located in the TRNC, is neither owned by, endorsed by, or bears any relationship with the TRNC government or my office. All expressions on that website to the contrary are bogus and against the wishes of the TRNC and my office. The TRNC has identified the current owner of that website and has asked him to cease and decision from making any such representations henceforth. (Exhibit 7).

11

31.     I surmise that the Plaintiffs have mistakenly drawn inferences from that website, which form the basis for several allegations in their Amended Complaint.

32.     The TRNC Washington, D.C. Representative Office has not owned or operated a website since November 2005.

33.     An earlier version of Plainitffs' Complaint attached renderings of website pages marked with the domain name "www.trncproperty.eu" and bearing a copyright symbol next to the words "Turkish Republic of Northern Cyprus Prime Ministry Property Information Office." This website is neither owned by, endorsed by, or bears any relationship with the TRNC government or my office. Further, I have been unable to access electronically the pages attached to the Amended Complaint because the website appears to no longer be active. One may access archived versions of the website via the following web address: http://web.archive.org/web/*/http:/www.trncproperty.eu, which indicates that the website existed for a period of approximately 6 months during the first half of 2008. In the most recent archived version, dated May 27, 2008, under the link for "Terms and Conditions" the website contains the following disclaimer divulging the website's complete lack of authorization by the TRNC and lack of any relationship therewith:

> When you access a Web site which does not belong to PRIME MINISTRY PROPERTY INFORMATION OFFICE OF THE TURKISH REPUBLIC OF NORTHERN CYPRUS, even if that Web site contains the logo of PRIME MINISTRY PROPERTY INFORMATION OFFICE OF THE TURKISH REPUBLIC OF NORTHERN CYPRUS, please note that that Web site is independent from PRIME MINISTRY PROPERTY INFORMATION OFFICE OF THE TURKISH REPUBLIC OF NORTHERN CYPRUS and PRIME MINISTRY PROPERTY INFORMATION OFFICE OF THE TURKISH REPUBLIC OF NORTHERN CYPRUS does not have any control over the content of that web site. Furthermore, a link to a Web site which does not belong

12

to PRIME MINISTRY PROPERTY INFORMATION OFFICE OF THE TURKISH REPUBLIC OF NORTHERN CYPRUS does not signify that PRIME MINISTRY PROPERTY INFORMATION OFFICE OF THE TURKISH REPUBLIC OF NORTHERN CYPRUS is responsible for the content of that Web site or that PRIME MINISTRY PROPERTY INFORMATION OFFICE OF THE TURKISH REPUBLIC OF NORTHERN CYPRUS approves or accepts the usage of such web sites.

(Exhibit 8) (available at:

http://web.archive.org/web/20080524061528/www.trncproperty.eu/index.php?men=391 &submen=0) (emphasis in the original). Finally, there is no such office as the "Prime Ministry Property Office of the Turkish Republic of Northern Cyprus." Property transactions in northern Cyprus are registered at the *Tapu Dairesi* (Land Registry Office), which is part of the TRNC Ministry of the Interior, and, to my present knowledge, does not have a website.

34.     The TRNC has identified several other websites that utilize the TRNC name and its various emblems without the authority of the TRNC government. The TRNC is working diligently to rectify this problem within the bounds of its laws, and the laws of the countries in which those websites are currently hosted. An example is our recent cease and desist letter addressed to Mr. Izzet Zorlu. (Exhibit 7).

Property on Cyprus:

35.     At present, there are no fewer than six crossing points along the Green Line through which Turkish Cypriots, Greek Cypriots, other E.U. citizens, and third party nationals may freely and peacefully pass back and forth between the two separately governed zones of the island of Cyprus. And on March 23 of the United Nations announced the commencement of construction work toward an additional crossing point. Even Americans who enter the island of Cyprus from a port or airport in the TRNC are

13

permitted passage back and forth between the zones.  During 2009 approximately 6.8 million crossings between the two parts of Cyprus were logged at the various crossing points, approximately one half them people crossing from south to north.  On any given day, approximately 1,400 Greek Cypriots enter northern Cyprus via these crossings. Allegations that Greek Cypriots are not permitted access to northern Cyprus are, therefore, untrue.  Further, the European Commission on the Green Line in Cyprus, an E.U. body, reported in its 2009 Annual Report that trade across the Green Line for the previous year registered approximately €6.1 million, or about $8.46 million.  (Available at, http://ec.europa.eu/cyprus/news/20090915_annual_report_on_green_line_en.htm).

36.     After the Turkish military intervention on the island in 1974, the Greek Cypriots generally moved to the southern part of the island and the Turkish Cypriots to the northern part.  United Nations personnel organized and assisted the population exchanges, which were otherwise voluntary, as recorded in the "Interim Report of the Secretary-General Pursuant to Security Council Resolution 370 (1975)" following the United Nations led bi-communal negotiations in Vienna.

37.     The nascent Turkish Federated State of Cyprus then adopted a law whereby Turkish Cypriots who had abandoned real property in southern Cyprus could be distributed properties of equal value abandoned by Greek Cypriots in northern Cyprus. In order to receive an abandoned property in the north, a Turkish Cypriot would be required to renounce all rights to his or her former property in the south.  Meanwhile, the Greek administration in southern Cyprus likewise requisitioned all Turkish Cypriot properties and eventually established a Turkish Cypriot property management department to hold abandoned Turkish Cypriot properties in trust.  It, however, forbade all Turkish

14

Cypriots of disposing of such property until the island is united, regardless of whether they renounced their rights.

38.      These dual systems have been challenged in a variety of recent court cases in Europe; no U.S. court has granted jurisdiction over such claims. An example of a case challenging the system in southern Cyprus is the matter of Nezire Sofi, who had filed suit in the European Court of Human Rights ("ECHR"), *Sofi v. Cyprus* (no. 18163/04). The Greek Cypriot government however agreed to settle the case days before the ECHR was due to hear the case on January 28, 2010. The Greek Cypriot government conceded publicly that its law that prevents Turkish Cypriots from disposing of their property violates the European Convention on Human Rights; and agreed both to pay Ms. Sofi €500,000 and to amend its law to conform with the Convention on Human Rights and Fundamental Freedoms, 13 U.N.T.S. 222, entered into force Sept. 3, 1953. An example of a case challenging the system in northern Cyprus is the matter of David and Linda Orams in which a Greek Cypriot who had abandoned his property in northern Cyprus sued the subsequent owners, British nationals, for rent, restitution and other damages at the Nicosia District Court in southern Cyprus. The court issued a default judgment in favor of the plaintiff, Mr. Meletios Apostolides, and he enforced the judgment outside of southern Cyprus through a European Court of Justice decision in case C-420/07, *Apostolides v. Orams*. The United Kingdom Court of Appeal upheld this decision on January 19 of this year. A separate appeal of the European Court of Justice decision by the British nationals remains under submission.

39.      To more fully adjudicate the claims of those who may have abandoned property in northern Cyprus and alleviate the need of claimants to appeal to the ECHR,

15

the TRNC adopted law 67/2005 (of December 22, 2005), which created the Immoveable Property Commission ("IPC"). The TRNC also created the IPC as a response to the case of *Xenides-Arestis v. Turkey*, in which the ECHR spoke favorably toward the dispute resolution mechanisms being implemented in the TRNC. The IPC began proceedings in 2006. The IPC has two international members, a German national and a Swedish national, which adds credence and impartiality to its work. The IPC offers a local remedy to dispossessed Greek Cypriots, or their heirs, in the form of restitution, exchange or compensation with respect to abandoned property.

40.     Some 456 Greek Cypriot applications have been received by the IPC. Ninety-four claims have been settled without need for a hearing.   Four claims have been settled after a full hearing.   Nearly all of the claims that have settled have resulted in compensation for the Greek Cypriots.   Five cases have been settled on the basis of restitution and compensation, two cases have been settled with exchange and compensation.    In one case the parties agreed to restitution in a reasonable period. In one case the commission ruled for partial restitution. The total compensation paid out in settlements to date to Greek Cypriots is approximately 40 million British pounds, or approximately $66.6 million.   (Statistics from the IPC are available at, http://www.kuzeykibristmk.org/english/istatistik.html). Allegations that Greek Cypriot claims are refused by the commission are, therefore, patently untrue.

41.     Plaintiffs' Amended Complaint on pagest 7-8, 9 excerpts several paragraphs of the TRNC law that creates and governs the IPC and argues that these passages amount to an admission that title in properties subject to its jurisdiction belong to certain individuals or a group.  This is an unwarranted interpretation and an attempt to

16

disparage the IPC. Yet, as described below, on March 5 of this year the European Court of Human Rights found the IPC to be a valid domestic Cypriot remedy whose exhaustion could be required prior to applying for ECHR jurisdiction.

41.     Most applications to the IPC request compensation, while the applications requesting restitution are a small minority of the cases. The ECHR heard the case of *Demopoulous v. Turkey*, 46113/99, which challenged the ability of the IPC to offer a sufficient remedy, on November 18, 2009. On March 5, 2010 the Court determined that, "[TRNC] Law 67/2005 provides an accessible and effective framework of redress in respect of complaints about interference with the property owned by Greek Cypriots," and thus the cases of the plaintiffs were, "rejected for non-exhaustion of domestic remedies. [The ECHR] is satisfied that Law 67/2005 makes realistic provision for redress in the current situation of occupation that is beyond this Court's competence to resolve."

42.     At the time the IPC was created, approximately 1,400 Greek Cypriot land claims cases were pending before the ECHR. It remains unclear whether the ECHR will declare these cases inadmissible for failure to exhaust the local remedy before the IPC.

Service of Process

43.     Service of the Summons and the original Complaint in this case was not made upon me, but upon Mr. Mehmet Kocak. Mr. Kocak is an independent contractor who serves as the driver for my staff and me. His duties for the TRNC Representative office do not extend beyond driving. He is not authorized in any way to speak on behalf of the TRNC or its Representative Office or me. Nor is he authorized to receive or accept

17

documents on our behalf. The process server did not ask for his identity when she served him with the document.

<u>Baseless and Overheated Rhetoric in the Amended Complaint</u>

44.     Finally, on behalf of my government and the Turkish Cypriot community, I express my outrage at the Plaintiffs' use of unjustified and slanderous language in the Amended Complaint, which refers to my government's acts as barbaric and refers to the TRNC as a mafia-like criminal organization. The Amended Complaint also makes allegations of ethnic cleansing as well as hatred against Greek Cypriots and Christians, without any articulated basis for such a harmful generalization. Perhaps most galling is the unsupported and irresponsible allegation at paragraph 48 of the Amended Complaint that the TRNC is a terrorism worry for the United States. Such inflammatory language and false allegations do nothing to move the peace and reconciliation process forward. A framework currently exists to promote reconciliation and a final political settlement on Cyprus and the leaders of the two communities continually meet on the basis of goodwill to pursue this goal. Litigation in a distant forum with no connection to the existing framework would only serve to exacerbate tensions and destabilize the parties' negotiations. I fear that this litigation is nothing more than a veiled effort to draw a U.S. federal court into the matter to disrupt the E.U and U.N. facilitated bilateral reconciliation process, which is supported by the U.S., and which has resulted in the most recent and promising round of negotiations to finalize the political solution on Cyprus, during which the leaders of the two communities have met over 60 times in the last 18 months.

I declare under penalty of perjury that the foregoing is true and correct.

_____

Mr. Hilmi Akil

Notarization:

State of _Washington_
County of _DC_

Sworn to and subscribed before me on
the 25th day of _February_ _2011_

Notary Public's Signature  _1-14-11_
My Commission Expires

18

# EXHIBIT 2

UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA

Toumazou,                                    )
et al.,                                      )
                                             )
Plaintiffs,                                  )    Civil Action No. 09-1967
                                             )    Judge Paul L. Freidman
v.                                           )
                                             )
Republic of Turkey                           )
                                             )
and                                          )
                                             )
Turkish Republic of Northern Cyprus          )
    Defendants.                              )
_____         )

## AFFIDAVIT OF MR. IZZET ZORLU

MR. IZZET ZORLU, under penalty of perjury hereby affirms:

1.      I am the current owner and operator of the website,

"www.trncwashdc.org."

2.      I reside at : Ögretmenler Cad. Hacıali Apt. B/3

                  Kermiya - Lefkoşa.

                  Northern Cyprus.

3.      I am not an employee of the government of the Turkish Republic of

Northern Cyprus or any other government.

1

4.      I presently earn my living providing tourism services to visitors to northern Cyprus. I do not coordinate these services in any way with the government of the Turkish Republic of Northern Cyprus or any of its offices overseas.

5.      The website, "www.trncwashdc.org" is not owned or operated by the government of the Turkish Republic of Northern Cyprus.

6.      I obtained the rights to use the domain name, "www.trncwashdc.org" in December 2007 when it became available after apparently having been abandoned by its prior owner.

7.      I have conducted research via "http://domain-history.domaintools.com," a respected internet based domain history research service. It records my purchase of the domain name, "www.trncwashdc.org" in December 2007. It also records the identity of the prior owner as Mr. Tony Sanchez of Athens, Greece, who apparently owned the domain name from December 2005 through October 2007. Finally, it records the TRNC Washington DC office as having first owned the domain name and then abandoning it sometime between October and December 2005.

8.      The TRNC government recently contacted me and informed me that I do not have its permission to make any representations on my website that would indicate that it is either owned, operated or endorsed by the TRNC government.

2

I declare under penalty of perjury that the foregoing is true and correct.

Mr. Izzet Zorlu

REPUBLIC OF CYPRUS                )
CITY OF NICOSIA                       )
EMBASSY OF THE UNITED STATES ) SS
OF AMERICA                             )

Notarization:

Subscribed and sworn before me
this day of      4 MAR 2010

_____
(date)

by: _____
(printed name[s])

Richard F. Hanrahan
Consul of the
United States of America

COMMISSION INDEFINITE
22 CFR 92.1

3

# EXHIBIT 3



**NIV-** 419107

DESCRIPTION:

☒ Male   ☐ Female

Height ........ ft. ........ in.

Born on DECEMBER 19, 1956. —

at CYPRUS —





Tariff Item No. 22
Fee Paid $........ NONE........
Local Cy equiv. .....NONE.......

OPTIONAL FORM 232
(FORMERLY FS—540)
DEPT. OF STATE
MARCH 1975

# EXHIBIT 4



**United States Department of State**

*Washington, D.C. 20520*

June 14, 2007

Dear Sir or Madam:

Mr. Hilmi Akil, holder of "Turkish Republic of Northern Cyprus" passport 200293, issued 09/21/06, expiring 09/20/11, is a person favorably known to the Department of State in his capacity as foreign lobbyist and as a formal representative of the Turkish Cypriot community in Washington, D.C. He is registered with the Department of Justice as a foreign lobbyist and interacts with Department of State officials on a regular, long-term basis.

Because the United States Government does not recognize the "Turkish Republic of Northern Cyprus" as a country, Mr. Akil is not eligible to receive a diplomatic visa or diplomatic status notwithstanding his capacity and purpose in the United States as an official representative of his community.

It has been the practice of the U.S. Government to extend the stay of persons such as Mr. Akil who represent the Turkish Cypriot community for successive one-year periods, up to a total of five years. The United States' overarching objective on Cyprus is to help foster a comprehensive settlement that reunifies the island into a bi-zonal, bi-communal federation between the Greek Cypriot and Turkish Cypriot communities.

I hope that understanding of his particular situation in Washington will facilitate Mr. Akil's regular activities in establishing himself. If you would like additional information, please call our office at (202) 647-6112.

Sincerely,

Douglas A. Silliman
Acting Deputy Assistant Secretary
European and Eurasian Affairs

# EXHIBIT 5



**TURKISH REPUBLIC OF NORTHERN CYPRUS**
**WASHINGTON OFFICE**
1667 K Street, N.W. Suite 690
Washington, D.C. 20006
Tel: (202) 887 6198 Fax: (202) 467 0685
E-mail: tmcdc@verizon.net

May 12, 2009

Mr. Joseph P. Albanese,
Attorney at Law,
10 Seguine Place,
Staten Island, NY. 10312.

Dear Mr. Albanese,

Enclosed please find the information for the supplemental statement covering the period November 1, 2008 – April 30, 2009.

Sincerely,

Hilmi Akil
Representative
Turkish Republic of Northern Cyprus

## REPORT OF THE TRNC WASHINGTON OFFICE
## COVERING THE PERIOD November 1, 2008 – April 30, 2009

### I- CHANGE IN OPERATIONS

1. Change in residence
   No change in residence.

2. Addition of new staff

   No addition of new staff.

### II- DISBURSEMENTS

See "Disbursements Summary" below

## TRNC WASHINGTON OFFICE
### (November 1, 2008 – April 30, 2009)

| | | |
|---|---|---|
| **SALARIES** | | $142,145.54 |
| Director | $ 40,039.10 | |
| Secretaries: Second Secretary | 32,756.06 | |
| Third Secretary | 31,200.38 | |
| Independent Contractor (N.Cinar) | 20,930.00 | |
| Independent Contractor (M.Koçak) | 17,220.00 | |
| **PERSONNEL HEALTH INSURANCE** | | $75,549.36 |
| **TRAVEL** | | $593.20 |
| **TELEPHONE, FAX and POSTAGE** | | $4,719.69 |
| Phone-fax (office+residence) | $4,196.00 | |
| Postage | $523.69 | |
| **RENT** | | $50,372.24 |
| Office | $29,692.24 | |
| Residence | $16,650.00 | |
| Garage | $2,980.00 | |
| Storage | $1,050.00 | |

| | | |
|---|---|---|
| MISCELLANEOUS SERVICES | | $6,299.75 |
| STATIONERY, PUBLICATIONS, SUBS. | | $1,687.99 |
| UTILITIES | | $ ----- |
| FUEL | | $ 757.40 |
| PURCHASES | | $ 898.07 |
| ENTERTAINMENT | | $9,125.71 |
| FURNITURE | | $ 759.69 |
| CASH ADVANCES | | $1,545.24 |
| BANK CHARGES | | $ 243.00 |
| | TOTAL: | $294,696.88 |

**Cash  Advances -**   $1,545.24

Cash Advances include the purchase of goods and services for Northern Cyprus.

CASH BALANCE

| | | |
|---|---|---|
| Bank account as of November 1, 2008 | | $56,468.83 |
| Add; | (x) | |
| Total funds received by April 2009 | | $384,845.00 |
| (xx) | | |
| Consulate fees | | $595.00 |
| Miscellaneous refunds | | $ ----- |
| | Total: | $441,908.83 |
| Deduct; | | |
| Total disbursements by April 30, 2009 | | $294,453.88 |
| (xxx) | | |
| Bank charges | | $243.00 |
| | Total: | $294,696.88 |
| Bank account as of April 30, 2009 | | $147,211.95 |

(x)
Funds received:

| | |
|---|---|
| Nov.  2008 | $  49,980.00 |
| Dec.   2008 | $  59,980.00 |
| Jan.   2009 | $  59,980.00 |
| Feb.  2009 | $  59,980.00 |
| March 2009 | $ 44, 975.00 |
| April  2009 | $109,950.00 |
| Total | $384,845.00 |

(xx)
Consulate fees          $595.00

| | |
|---|---|
| Total | $385,440.00 |

(xxx)
Bank charges

| | |
|---|---|
| Nov.  2008 | $  12.00 |
| Dec.   2008 | $141.00 |
| Jan.   2009 | $  12.00 |
| Feb.  2009 | $  12.00 |
| March 2009 | $  12.00 |
| April  2009 | $  54.00 |
| Total | $243.00 |

## III- ACTIVITIES

### DETAILS OF CONTACTS WITH U.S. OFFICIALS
#### (November 1, 2008 – April 30, 2009)

Jan 27, 2009        Meeting with Carol Migdalovitz, Specialist in Middle East Affairs, Foreign Affairs, Defense, and Trade Division. (Library of Congress).

Jan 28, 2009        Meeting with Congressman Robert Wexler`s (D-Florida) Legislative Director Jonathan Katz. (Rayburn Office House Building).

Feb 6, 2009         Meeting with Congressman Robert Wexler`s (D-Florida) Legislative Director Jonathan Katz and Senior Professional Staff Member on Committee on Foreign Relations Alan Makovsky (Rayburn Office House Building).

March 23, 2009    Meeting with Congresswoman Kay Granger's (R-TX) Senior
                  Legislative Assistant Rachel Carter. (Canon House Building).

April 13, 2009    Meeting with Kathy Fitzpatrick, Director Southern European Affairs
                  of the State Department. (State Department).

### ENTERTAINMENT
**(Lunches, Dinners and Drinks with US Officials)**
**(November 1, 2008 – April 30, 2009)**

Nov. 10, 2008     Lunch with DCM of U.S Embassy in Nicosia, Jonathan Cohen and
                  Terry Netos, Cyprus Desk Officer (Oval Room)

Dec. 23, 2008     Lunch with Hesham Islam, Special Assistant for International
                  Affairs to the Deputy Secretary of Defense (McCommricks and
                  Schmidt)

March 5, 2009     Attended lunch organized by "The U.S. Association of Former
                  Members of Congress" (Capitol Building)

In addition to these meetings listed above, to the best of my recollection, telephone contacts were made during the period with, Terry Netos, Cyprus Desk Officers of the State Department, Kathy Fitzpatrick, Director of Southern European Affairs of the State Department and Jonathan Katz Legislative Director to Congressman Robert Wexler (D-Florida).

### COMMUNICATIONS; "TELEPHONE - FAX EXPENSES"

| Date | Check No. | Company | Amount |
|---|---|---|---|
| Nov. 4 | 2381 | AT & T | 163.03 |
| Nov. 10 | 2383 | Comcast | 129.34 |
| Nov. 13 | 2384 | Comcast | 101.90 |
| Dec. 3 | 2401 | Verizon | 376.00 |
| Dec. 3 | 2403 | AT & T | 138.81 |
| Dec. 9 | 2404 | Comcast | 101.90 |
| Dec. 9 | 2405 | Comcast | 131.34 |
| Jan. 6 | 2427 | Comcast | 101.90 |
| Jan. 6 | 2428 | AT & T | 134.55 |
| Jan. 6 | 2429 | Verizon | 359.41 |

| Jan. 8 | 2432 | Comcast | 164.81 |
| Feb. 3 | 2448 | AT & T | 134.17 |
| Feb. 3 | 2449 | Verizon | 474.49 |
| Feb. 9 | 2451 | Comcast | 127.49 |
| Feb.10 | 2452 | Comcast | 67.78 |
| March 3 | 2472 | Verizon | 378.00 |
| March 4 | 2473 | AT & T | 144.49 |
| March 9 | 2474 | Comcast | 128.17 |
| March 13 | 2477 | Comcast | 80.75 |
| April 2 | 2493 | AT & T | 134.36 |
| April 2 | 2494 | Verizon | 406.73 |
| April 8 | 2497 | Comcast | 135.83 |
| April 9 | 2498 | Comcast | 80.75 |

**TOTAL**    **$4,196.00**

## IV- DISSEMINATION

During this period our Office disseminated the attached documents to the members of the Senate Foreign Relations Committee and House International Relations Committee. See attached "Dissemination Summary".

| Feb.10 | 2452 | Comcast | 67.78 |
|--------|------|---------|-------|
| March 3 | 2472 | Verizon | 378.00 |
| March 4 | 2473 | AT & T | 144.49 |
| March 9 | 2474 | Comcast | 128.17 |
| March 13 | 2477 | Comcast | 80.75 |
| April 2 | 2493 | AT & T | 134.36 |
| April 2 | 2494 | Verizon | 406.73 |
| April 8 | 2497 | Comcast | 135.83 |
| April 9 | 2498 | Comcast | 80.75 |

|  |  |  | ------------ |
|  |  | **TOTAL** | **$4,196.00** |

## IV- DISSEMINATION

During this period our Office disseminated the attached documents to the members of the Senate Foreign Relations Committee and House International Relations Committee. See attached "Dissemination Summary".

## Statement by President Talat Following his Meeting with Political Party Leaders

Following is the common ground reached after the evaluation meeting we had today with the political parties represented in the National Assembly.

With the decision it has issued on 28 April 2009, the Court of Justice of the European Communities (ECJ) has made a serious mistake by deeming the Orams case as a private civil case between two individuals and ignoring the fact that there are two different laws in force in two sides of Cyprus. It is not possible to accept this decision which ignores the extraordinary circumstances in Cyprus.

This decision of the ECJ has also had serious negative effects over the ongoing negotiation process in Cyprus. Provided that the British Court of Appeal, which will be the last to conclude the legal process regarding the Orams Case that has not been completed yet, produces a decision ignoring the facts in Cyprus just as the ECJ did, the negotiation process will be damaged in an irreparable manner.

We would like to stress once again that, initiatives to separate the property issue in Cyprus from the comprehensive settlement of the Cyprus problem and to solve it through individual cases filed at courts, not only damage the relations between the two sides but have negative effects over the negotiation table as well.

International public opinion, the UN, the EU and the Greek Cypriot side should acknowledge that, any method produced for the settlement of the property issue in Cyprus which takes only the individual preferences into consideration or weakens the principle of bi-zonality will never be accepted by the Turkish Cypriot side under any circumstances.

The Turkish Cypriot people and the EU member state citizens, who own an immovable property in the TRNC, should also acknowledge that the Presidency and all the political parties represented in the National Assembly of the TRNC will closely follow the issue and will not refrain from acting in solidarity to adopt all kinds of measures for the protection of the well-being and rights of our people.

*Presidential Press Office*
29-04-2009

Fall 2008
Volume 7, No. 3

# CYPRUS SHOULD NOT MISS WHAT MAY BE THE LAST CHANCE FOR UNIFICATION AND A COMMON FUTURE

*Despite the presence of a huge body of work of the UN, never before in the history of Cyprus negotiations had the two parties agreed on so much that defines the path to the solution of the problem ... It is the expectation of the two peoples in Cyprus, as well as that of the international community as a whole, that the current two leaders will rise to the occasion and bring this protracted problem to a mutually acceptable conclusion.*

## Mehmet Ali Talat.



* President of the Turkish Republic of Northern Cyprus.



(January 23, 2009)

The Cyprus issue has been on the agenda of the United Nations for almost half a century. It is a problem that so far has defied all settlement efforts undertaken by successive UN Secretaries-General. The failure to solve the problem however does not necessarily mean that it is intractable, but it indicates that the lack of any incentive for a solution on the part of Greek Cypriot side has been a huge obstacle for the settlement efforts. The fact that the Greek Cypriot side has been unlawfully and unfairly recognized, since 1963, as "the Government of the Republic of Cyprus," and under this title has continued to be a member of the United Nations and has also become a European Union member as of 1 May 2004, has encouraged it to pursue a policy of extending its authority over the whole island rather than concluding an agreement with the Turkish Cypriots on the basis of a power-sharing arrangement between the two sides.

Although the efforts of the UN through the good offices mission of the Secretary-General have so far not brought a comprehensive settlement to the island, the accumulated work nevertheless has shaped the basic parameters which would be part and parcel of any future settlement in Cyprus. This body of work, as the UN terms it, covers all settlement efforts to this date, most importantly the UN Comprehensive Settlement Plan of 31 March 2004, a blueprint that comprises approximately 9000 pages and is a culmination of four decades of negotiations. The rejection of this internationally endorsed plan by the Greek Cypriots through a resounding "no" in the referendum as called for by the then Greek Cypriot leader, Mr Tassos Papadopoulos, was a major setback in the settlement efforts which led to more than four years of deadlock in the negotiations. Furthermore, the plan has been demonized by the Greek Cypriot side ever since and has been portrayed as the source of all evil. The UN and particularly the then Secretary-General, whom the plan was named after, was blamed by the Greek Cypriot side for the failure. The Greek Cypriots have rejected the plan through their commonly expressed will. This has to be respected. At the same time, however, Turkish Cypriot overwhelming "yes" vote for the Plan, despite the great sacrifices it entailed for them, deserves not only respect but also requires taking necessary steps by the third parties, in line with the promises given and decisions taken since 2004, to end the unjust and unjustified isolation of the Turkish Cypriots.

The lifting of isolations of Turkish Cypriots is not an end in itself, but will be an important step towards a comprehensive settlement by leveling, at least to some extent, the playing field between the two sides on the island. It will also lead



to a smoother unification as the economic disparity between the two sides will be reduced. The lifting of isolations will restore the confidence of the Turkish Cypriots in the international community and particularly in the EU which has been seriously damaged since 2004 as a result of the fact that despite their expressed will for compromise and EU membership, Turkish Cypriots were left out in the cold through no fault of their own. The EU, for its share, must first decide whether Turkish Cypriots are EU members or not. Saying that they are, but at the same time subjecting them to isolations cannot go hand in hand. How can one be considered as European if he/she is not allowed, among other things, to travel and trade freely in Europe? It is about time that the isolations on the Turkish Cypriots are lifted in preparation for the not-too-distant day when they take their rightful place in the EU as the equal partner of the Greek Cypriots in a united Cyprus.

Since 2004 I have spent a lot of time and energy in convincing the Greek Cypriot leadership to initiate full-fledged negotiations. With the election of Mr Dimitris Christofias –who was a major figure in the "no" camp at the 2004 referenda, but underlined the need for a settlement during his election campaign– as the new Greek Cypriot leader in the South on 24 February 2008, the longstanding deadlock in the negotiations has come to an end. Within a couple of months, in line with the constructive and flexible approach of the Turkish Cypriot side, we agreed with him to start full-fledged negotiations under the auspices of the good offices mission of the UN Secretary-General. As a further sign of the prevailing positive atmosphere created by the two leaders, the UN Secretary-General appointed, with the consent of the two sides, Mr Alexander Downer, a former Australian foreign minister, as his new Special Adviser on Cyprus. This appointment demonstrates the UN's commitment to the negotiations.

Full-fledged negotiations commenced on 3 September 2008 pursuant to four important agreements between me and Mr Christofias (on 21 March, 23 May, 1 July and 25 July 2008). Accordingly, we have agreed that our common goal is to create a bizonal, bicommunal federation with political equality, and that in this federation there will be a Turkish Cypriot State and a Greek Cypriot State, as Constituent States with equal status, as well as a Federal Government and that this partnership will have a single international personality. We also took up the issues of single sovereignty and citizenship and agreed on these in principle, deciding to take up their details in our future negotiations. We further agreed that the new settlement plan will be approved by our people through separate



simultaneous referenda. Despite the presence of a huge body of work of the UN, never before in the history of Cyprus negotiations had the two parties agreed on so much that defines the path to the solution of the problem. The fact that we managed to achieve this convergence with Mr Christofias in just a few months is very encouraging.

Still, it is clear that in order to reach a settlement in Cyprus within a reasonable time, the established UN parameters and the UN body of work accumulated during four decades of negotiations, which culminated in the comprehensive settlement plan of 2004, cannot and should not be put aside. Keeping in mind, we started by discussing the topic of Governance and Power-Sharing, which is one of the six core issues that we have identified together; and we will continue with the topics of Property, Economy, European Union Matters, Territory Security and Guarantees.

The Turkish Cypriot side believes that a comprehensive settlement is possible and achievable in the course of the first half of 2009, given that every aspect of the Cyprus problem has been discussed and negotiated in detail during four decades of negotiations. What has been lacking so far was the political will and courage to engage into a meaningful give-and-take process to finalize the comprehensive settlement, within the spirit of compromise and reconciliation. It is the expectation of the two peoples in Cyprus, as well as that of the international community as a whole, that the current two leaders will rise to the occasion and bring this protracted problem to a mutually acceptable conclusion.

The role of the international community during the negotiations will also be very important for a successful outcome. There is no doubt that an issue which has been on the agenda of the United Nations for almost half a century is an international problem. Although the two sides in Cyprus are the main actors in the negotiations, the role and the responsibility of the guarantor powers (United Kingdom, Turkey and Greece) in a settlement cannot be overlooked. Their main responsibility is to encourage the two sides for a mutually acceptable compromise settlement on the island. Turkey supports the Turkish Cypriot side's efforts to reach a just and fair settlement in Cyprus. This support has also played a major role in the overwhelming "yes" vote of the Turkish Cypriot people to the UN Comprehensive Settlement Plan in 2004. With their positive stance in 2004, Turkey and the Turkish Cypriot side have proved, beyond any doubt, their sincerity for a settlement. If the other two guarantors also act in line with their

responsibilities, the chances of success of the current initiative will be much higher. The UN, on the other hand, should encourage the two sides to negotiate on the basis of established UN parameters and body of work. Otherwise, any effort to deviate from the accumulated work would mean to discard the product of four decades of negotiations and start from the scratch. Certainly, Cyprus cannot wait another forty years for a settlement.

The process of negotiations will not be easy. There are some major differences between the two sides. Finding a compromise between them will require flexibility from both sides. We must aim at finding a settlement that would not rock the boat more than it is necessary. The issue of property, which is the most complex and probably the most difficult topic to be dealt with, is a good example. It is unrealistic to expect that all Greek Cypriots and Turkish Cypriots displaced by the tragic events of the past will be able to return to their former properties. The return of a big number of Greek Cypriots to their former homes would create tremendous political and economic instability in the Turkish Cypriot Constituent State (the Turkish Cypriot administered State in the North after a settlement) by making thousands of Turkish Cypriots currently living in these properties refugees once again after more than three decades. Some of these Turkish Cypriots have already become refugees two to three times since 1963 in such a small island. The issue of property should be dealt with in a manner making use of all the options available for the exercise of property rights, namely compensation, exchange and restitution.

As for the issue of governance and power-sharing, the political equality of the two peoples in the new partnership should be safeguarded in a settlement and necessary mechanisms should be devised to implement this effectively in the workings of the state machinery. The distinct identities of Turkish Cypriot people and Greek Cypriot people should be respected and preserved in the agreement. Effective mechanisms must be established to prevent one people from exercising jurisdiction or authority over the other. Cyprus is the common home of Turkish Cypriots and Greek Cypriots. Their relationship within the context of a settlement should be organized in a manner fully reflecting this reality.

The issue of security and guarantees is also important for the Turkish Cypriots. The Cyprus history is full of grievances and sorrow. To prevent the repetition of the past events, the continuation of the 1960 Treaties of Guarantee and of Alliance is crucial.



Coming to the possible role of the EU with respect to the UN led talks, I attach great importance to the European Commission's oft-stated position that the EU will accommodate any solution reached by the two sides in Cyprus, provided these are in line with the principles on which the EU is founded. This is of vital importance because a solution will necessarily call for both transitional and permanent safeguards within the EU. Therefore, it is clear that at future stages of negotiations we will need the EU to provide technical assistance on relevant issues. Considering that Greek Cypriots already enjoy full access to the resources and experience in EU, Turkish Cypriot side will need separate channels of communication with the Commission to compensate for this asymmetry.

Of course, the prime concern here is ensuring legal certainty of the settlement within the EU. Adaptation as envisaged by Protocol 10 Article 4 cannot be accepted by the Turkish Cypriot side for various legal and political reasons. We cannot have a solution that is open to legal challenges or gives the impression that we have been integrated to the "Republic of Cyprus". Provisions of the settlement should become Primary Law and this should be done in a politically acceptable manner. Now that Ireland has been promised that its interests will be taken into account in a special protocol to be prepared for the next member state to join the EU (probably Croatia), it is not unreasonable for Turkish Cypriots to seek a similar arrangement.

It is unfair for EU to put pressure on Turkey to open her ports to Greek Cypriot vessels and planes while Turkish Cypriots are still under isolation despite the EU's own decisions and commitments to end the isolation. Surely, it must be clear to all that such a development would destabilize the ongoing negotiations by tilting the balance further in favor of the Greek Cypriot side.

The choice today before the two sides in Cyprus is clear. We will both strive for a common future and show the flexibility required to solve the Cyprus problem, or we will be forced to accept the permanent division of the island. If we opt for settlement and unification, we must act without further delay and find a solution in the shortest possible time. The island of Cyprus has been identified with problems and conflicts for too long. It is time for it to become an island of reconciliation and peaceful coexistence. Greek Cypriots and Turkish Cypriots are civilized and well-educated people who are capable of realizing this dream.

I am hopeful that this time the negotiations will yield a result and the long-awaited settlement of the Cyprus problem will be realized. Turkish Cypriots and Greek Cypriots will once again become partners rather than adversaries. They will enjoy the benefits of EU membership together and strive for a better life standard for everyone living on the island of Cyprus. The settlement will also consolidate prosperity and stability in the Eastern Mediterranean region. The already developing relations between Turkey and Greece will enter into a new phase. With the eventual membership of Turkey to the European Union, the south-eastern part of the European Union will be a hub of peace, cooperation and prosperity that will definitely contribute to Europe's desire to be a strong global player.

# TURKISH CYPRIOT OFFICE IN DOHA

### (Report by Anatolian News Agency)

Turkish Cypriot "Trade and Tourism Office" was opened in Qatar capital Doha on November 23, 2008. The office is the 13th to be opened in foreign countries and the move came in spite of intense efforts by the Greek Cypriot Administration to maintain the international isolation on the Turkish Cypriot people.

In an address at the opening reception, Turkish Cypriot Foreign Minister Turgay Avcı said that the Office will make it possible for the TRNC and Qatar to establish social and cultural ties and to cooperate in the fields of trade, tourism and sports. "Kuwait and Oman are two possible locations where similar offices can be opened" the Minister added.

Mr Avcı stated that the Turkish Cypriot side is conducting negotiations with the Greek Cypriot side with the aim of solving the Cyprus problem while it is continuing with efforts towards the further development of Northern Cyprus.

The Representative of the TRNC in Doha Arif Altay, for his part, expressed the belief that the office will play a significant role in establishing ties between the two countries.

The Turkish Minister for Culture and Tourism Ertuğrul Günay – who is also in Qatar – welcomed the opening of the office in Qatar, which he said is amongst the most rapidly growing countries in the region.

Also speaking at the opening ceremony, the Representative of the Embassy of Kuwait in Doha, Zeiad Al-Banaie, pointed out that the opening of the office in Qatar was important for further developing relations between Northern Cyprus and countries in the Gulf region and that he hoped an office would also be opened in Kuwait.

Meanwhile, Eldar Salimev, the Ambassador of Azerbaijan to Doha said that he believed the office in Qatar would contribute to improving even further the economic and tourism relations between Qatar and the TRNC. (AA)

(November 24, 2008)



**TURKISH REPUBLIC OF NORTHERN CYPRUS**
**<u>WASHINGTON OFFICE</u>**
1667 K Street, N.W. Suite 690
Washington, D.C. 20006
Tel: (202) 887 6198 Fax: (202) 467 0685
E-mail: trncdc@verizon.net

December 4,  2009

Mr. Joseph P. Albanese,
Attorney at Law,
10 Seguine Place,
Staten Island, NY. 10312.

Dear Mr. Albanese,

Enclosed please find the information for the supplemental statement covering the period  May 1, 2009– October 31, 2009.

Sincerely,

Hilmi Akil
Representative
Turkish Republic of Northern Cyprus

## REPORT OF THE TRNC WASHINGTON OFFICE
## COVERING THE PERIOD May 1, 2009 – Octobober 31, 2009

### I- CHANGE IN OPERATIONS

1. Change in residence
    No change in residence.

2. Addition of new staff

    No addition of new staff.

### II- DISBURSEMENTS

See "Disbursements Summary" below

### TRNC WASHINGTON OFFICE
### (May 1, 2009 – October 31, 2009)

| | | | |
|---|---|---|---|
| SALARIES | | | $129,400.00 |
| | Director | $ 36,660.00 | |
| | Secretaries: Second Secretary | 30,540.00 | |
| | Third Secretary | 29,340.00 | |
| | Independent Contractor (N.Cinar) | 18,100.00 | |
| | Independent Contractor (M.Koçak) | 14,760.00 | |
| PERSONNEL HEALTH INSURANCE | | | $85,599.13 |
| TRAVEL | | | $63.30 |
| TELEPHONE, FAX and POSTAGE | | | $5,065.26 |
| | Phone-fax (office+residence) | $4,507.43 | |
| | Postage | $ 557.83 | |
| RENT | | | $50,797.24 |
| | Office | $29,457.24 | |
| | Residence | $17,290.00 | |
| | Garage | $ 3,000.00 | |
| | Storage | $ 1,050.00 | |

2

| | | |
|---|---|---|
| MISCELLANEOUS SERVICES | | $4,188.67 |
| STATIONERY, PUBLICATIONS, SUBS. | | $  913.12 |
| UTILITIES | | $  ----- |
| FUEL | | $  726.74 |
| PURCHASES | | $  327.54 |
| ENTERTAINMENT | | $3,106.08 |
| FURNITURE | | $3,134.92 |
| CASH ADVANCES | | $23,849.73 |
| BANK CHARGES | | $  109.10 |
| | TOTAL: | $307,280.83 |

**Cash  Advances** -   $23,849.73

Cash Advances include the purchase of goods and services for Northern Cyprus.

<u>CASH BALANCE</u>

| | | |
|---|---|---|
| Bank account as of May 1, 2009 | | $142,321.95 |
| Add; | (x) | |
| Total funds received by October 2009 | | $244,875.00 |
| (xx) | | |
| Consulate fees | | $    2,052.00 |
| Miscellaneous refunds | | $    ----- |
| | Total: | $389,248.95 |
| Deduct; | | |
| Total disbursements by October 31, 2009 | | $307,389.93 |
| (xxx) | | |
| Bank charges | | $109.10 |
| | Total: | $307,280.83 |
| Bank account as of October 31, 2009 | | $81,968.12 |

3

(x)
Funds received:

| | | |
|---|---|---|
| May | 2009 | $ 49,975.00 |
| June | 2009 | $ 44,975.00 |
| July | 2009 | $ ---- |
| Aug. | 2009 | $ 49,975.00 |
| Sept. | 2009 | $ 49,975.00 |
| Oct. | 2009 | $ 49,975.00 |
| | Total | $244,875.00 |

(xx)
Consulate fees                    $    2,052.00

| | | |
|---|---|---|
| | Total | $231,927.00 |

(xxx)
Bank charges

| | | |
|---|---|---|
| May | 2009 | $ 57.00 |
| June | 2009 | $ 12.00 |
| July | 2009 | $ ---- |
| Aug | 2009 | $ 12.00 |
| Sept. | 2009 | $ 12.00 |
| Oct. | 2009 | $ 16.10 |
| | Total | $109.10 |

III- ACTIVITIES

## DETAILS OF CONTACTS WITH U.S. OFFICIALS
### (May 1, 2009 – October 31, 2009)

| | |
|---|---|
| July 24, 2009 | Meeting with Congressman Michael McMahon`s (D-13[th] NY) Legislative Assistant Naz Durakoğlu and Staff Member, Committee on Foreign Affairs, U.S. House of Representatives Brian Forni. (TRNC Representative Office). |
| July 27, 2009 | Meeting with Congressman Tim Ryan`s (D-17[th] OH) Legislative Assistant Robert Bacon (TRNC Representative Office). |
| July 28, 2009 | Meeting with the U.S. Ambassador to Cyprus, Frank Urbancic and Cyprus Desk Officer Terry Netos. (State Department). |
| Sept.10, 2009 | Meeting with Congressman Tim Ryan`s (D-17[th] OH) Legislative Assistant Robert Bacon (TRNC Representative Office). |

| Sept. 22, 2009 | Meeting with members of the Foreign Relations Council (Rayburn House Office Building – as part of President Mehmet Ali Talat`s delegation). |
| --- | --- |
| Sept. 22, 2009 | Meeting with Senator Richard Durbin (Capitol Building – as part of President Mehmet Ali Talat`s delegation). |
| Sept 22, 2009 | Meeting with Congressman Robert Wexler (D-Florida). (Rayburn Office House Building – as part of President Mehmet Ali Talat`s delegation). |

## ENTERTAINMENT
### (Lunches, Dinners and Drinks with US Officials)
### (May 1, 2009 – October 31, 2009)

| June 3, 2009 | Attended lunch organized by "The U.S. Association of Former Members of Congress" in honor of the Turkish Foreign Minister Prof. Ahmet Davutoğlu (Capitol Building). |
| --- | --- |
| Sept. 16, 2009 | Attended lunch organized by "The Congressional Study Group on Turkey" in honor of the President of the Turkish Union of Chambers and Commodity Exchanges Rıfat Hısarcıklıoğlu |
| Oct 30, 2009 | Lunch with Kathy Fitzpatrick, Director, Office of Southern European Affairs of the State Department, Robert Riley, Deputy Director, Office of Southern European Affairs and Cyprus Desk Officer Terry Netos. (701) |

In addition to these meetings listed above, to the best of my recollection, telephone contacts were made during the period with, Terry Netos, Cyprus Desk Officer of the State Department, Robert Bacon, Legislative Assistant to Congressman Tim Ryan (D-17th OH) and Naz Durakoğlu, Legislative Assistant to Congressman Michael McMahon (D-13th NY).

## COMMUNICATIONS; "TELEPHONE - FAX EXPENSES"

| Date | Check No. | Company | Amount |
| --- | --- | --- | --- |
| May 4 | 2518 | AT & T | 138.41 |
| May 8 | 2520 | Verizon | 410.74 |
| May 11 | 2521 | Comcast | 127.61 |
| May 12 | 2522 | Comcast | 80.75 |
| June 2 | 2539 | AT & T | 145.23 |
| June 2 | 2540 | Verizon | 386.20 |
| June 9 | 2543 | Comcast | 80.75 |
| June 11 | 2544 | Comcast | 127.61 |
| July 6 | 2563 | Verizon | 383.82 |
| July 7 | 2564 | AT & T | 159.28 |

| | | | |
|---|---|---|---|
| July 7 | 2566 | Comcast | 80.75 |
| July 13 | 2567 | Comcast | 127.75 |
| Aug. 3 | 2583 | AT & T | 136.03 |
| Aug. 3 | 2584 | Verizon | 350.31 |
| Aug. 10 | 2587 | Comcast | 131.69 |
| Aug. 11 | 2588 | Comcast | 80.75 |
| Sept. 1 | 2604 | Verizon | 426.12 |
| Sept. 2 | 2605 | AT & T | 157.78 |
| Sept. 3 | 2607 | Comcast | 80.75 |
| Sept. 3 | 2608 | Comcast | 129.07 |
| Oct. 1 | 2628 | Verizon | 392.48 |
| Oct. 1 | 2629 | AT & T | 159.43 |
| Oct. 13 | 2632 | Comcast | 133.37 |
| Oct. 13 | 2634 | Comcast | 80.75 |

**TOTAL**    **$4,507.43**

## IV- DISSEMINATION

During this period our Office disseminated the attached documents to the members of the Senate Foreign Relations Committee and House International Relations Committee. See attached "Dissemination Summary".

**Opening of Yeşilırmak/Limnitis Crossing and Access To and From Erenköy/Kokkina**

1. The two leaders decided to proceed with the opening of Yeşilırmak/Limnitis crossing point under normal rules of existing crossings.

2. In the context of this agreement, the role of UNFICYP is underscored.

3. Crossing of persons wishing to visit Erenköy/Kokkina will take place with the escort of UNFICYP. The visits will be made by minibuses on Wednesdays, Saturdays and Sundays. The T/C side may request UNFICYP escort for one or two extra minibus(es) a week.

4. There will be transfer of reasonable quantities of food and water and other supplies of non-military nature with UNFICYP escort to Erenköy/Kokkina.

5. Erenköy/Kokkina will be connected to the nearest electricity grid before the opening of the crossing point.

6. Humanitarian issues:

(a) Ambulances.

Ambulances will be able to visit Erenköy/Kokkina to move sick persons. The rules governing the crossing of ambulances will apply. Reciprocally, G/C ambulances will cross in the opposite direction to hospitals in Nicosia.

(b) Fire Engines and Water Tanks.

In case of fire, T/C fire engines and accompanying water tanks will be able to call at Erenköy/Kokkina.

7. There will be reciprocal arrangements from time to time for specific events through this and other crossing points.

---------------------------------------------------------------------------------

*This document is printed from the Official Website of the TRNC Presidency*

TRNC Washington Office
1667 K Street, N.W., Suite 690
Washington, D.C. 20006
Tel. 202 887-6198 Fax. 202 467-0685

29 June, 2009

# EXHIBIT 6



**Department of the Treasury
Financial Crimes Enforcement Network**

**Advisory**

**FIN-2009-A005**
**Issued:   July 23, 2009**
**Subject:  Withdrawal of Advisory FIN-2008-A003**

This Advisory is being issued to inform banks and other financial institutions operating in the United States that Financial Crimes Enforcement Network (FinCEN) Advisory FIN-2008-A003 (issued March 20, 2008), regarding the area of Cyprus administered by Turkish Cypriots (northern part of Cyprus), is hereby withdrawn.

Since the issuance of FinCEN's Advisory FIN-2008-A003, the Financial Action Task Force (FATF), as reflected in its October 2008 decision[1], has welcomed the significant progress made in the northern part of Cyprus and noted that it had substantially addressed the anti-money laundering/counter financing of terrorism (AML/CFT) deficiencies that FATF had identified. FATF further encouraged the northern part of Cyprus to continue to improve its AML/CFT system.  These significant reforms substantially address the deficiencies listed in Advisory FIN-2008-A003, and the northern part of Cyprus has taken concrete steps to bring these reforms into effect. As a result of the enactment of new laws and the beginning of effective implementation, the enhanced scrutiny called for in Advisory FIN-2008-A003 with respect to transactions involving the northern part of Cyprus is no longer necessary.

The withdrawal of Advisory FIN-2008-A003 does not relieve financial institutions of their pre-existing and ongoing obligation to report suspicious activity, as set forth in regulations issued by FinCEN and by the federal banking regulatory agencies, as well as their obligation to comply with all other applicable provisions of law. In complying with their suspicious activity detection and reporting obligations, U.S. financial institutions may wish to consider that transactions involving banks in the northern part of Cyprus may not be readily apparent because banks operating in the northern part of Cyprus do not have the ability to initiate or receive wire transfer instructions using standardized messaging systems without the assistance of third-country based financial institutions.

---

[1] http://www.fatf-gafi.org/dataoecd/25/17/41508956.pdf

# EXHIBIT 7



**TURKISH REPUBLIC OF NORTHERN CYPRUS**
**MINISTRY OF FOREIGN AFFAIRS**

(Lefkoşa, via Mersin-10 Turkey)

İzzet ZORLU
Öğretmenler Caddesi
Hacıali Apt.  B/3 Kermiya
Lefkoşa.

4 March 2010

Dear Mr. Zorlu,

The government of the Turkish Republic of Northern Cyprus has learned that you presently maintain an internet website with the address, www.trncwashdc.org and that this website utilizes the TRNC name, flag and a copyright symbol possibly giving the impression that your site is owned or endorsed by the TRNC government.  You neither requested nor received any authorization from the TRNC government to place any image or other content on your website that might make it appear affiliated with the government or any of its representative offices overseas.  We hereby ask you to cease and desist from making any representations on your website that would imply that the site is endorsed or owned by the TRNC.  We would consider a mere disclaimer insufficient.

Thank you for your cooperation.

Aytuğ Plümer
Under-Secretary

# EXHIBIT 8

**Buying** Property

- Home
- About TRNC
- Estate Agents
- Estate Agency Law
- Ownership Information
- Home Buyer`s Handbook
- Application Form
- FAQ

**Information** Office

- About Us
- News
- Useful Links
- Useful Tel. Numbers
- Make an Appointment
- Contact

# Terms and Conditions

Terms and Conditions for the use of the Web Site of the Prime Ministry Property Information Office of the Turkish Republic of Northern Cyprus

This Web site may contain information regarding copyright information and warnings. It is necessary to comply with these warnings and information. Information on this web site may contain technical and typographic errors.

Information on this web site may be changed or updated without any warning. PRIME MINISTRY PROPERTY INFORMATION OFFICE OF THE TURKISH REPUBLIC OF NORTHERN CYPRUS may at all times make betterments and/or changes to the content and/or information defined hereby.

PRIME MINISTRY PROPERTY INFORMATION OFFICE OF THE TURKISH REPUBLIC OF NORTHERN CYPRUS does not accept any responsibility regarding the accuracy of the information provided by the Web site of PRIME MINISTRY PROPERTY INFORMATION OFFICE OF THE TURKISH REPUBLIC OF NORTHERN CYPRUS and the use of such information is at the receiver's discretion.

PRIME MINISTRY PROPERTY INFORMATION OFFICE OF THE TURKISH REPUBLIC OF NORTHERN CYPRUS does not provide any licences, copyright, patents or any other intellectual property rights to the information provided on the Web site.

PRIME MINISTRY PROPERTY INFORMATION OFFICE OF THE TURKISH REPUBLIC OF NORTHERN CYPRUS does not ask for confidential or private information. Please take into

Case 1:09-cv-01967-PLF   Document 17   Filed 04/01/10   Page 120 of 122

consideration that any data or material you send to PRIME MINISTRY PROPERTY INFORMATION OFFICE OF THE TURKISH REPUBLIC OF NORTHERN CYPRUS will NOT be considered confidential by PRIME MINISTRY PROPERTY INFORMATION OFFICE OF THE TURKISH REPUBLIC OF NORTHERN CYPRUS.

By sending any data or material to PRIME MINISTRY PROPERTY INFORMATION OFFICE OF THE TURKISH REPUBLIC OF NORTHERN CYPRUS, you accept giving permission which is impossible to withdraw and which cannot be restricted to the Prime Ministry Property Office to reproduce, display, put into, change, transmit and distribute these materials and/or data; you furthermore accept the possible free use of any idea, concept, "know-how" or techniques you send to PRIME MINISTRY PROPERTY INFORMATION OFFICE OF THE TURKISH REPUBLIC OF NORTHERN CYPRUS, by MINISTRY PROPERTY INFORMATION OFFICE OF THE TURKISH REPUBLIC OF NORTHERN CYPRUS. However, we will not publish your name or we will not publicise the data or materials you send;

(a) if we do not have the permission to use your name; or

(b) if we do not inform you beforehand that we will publish or use the material or data with your name that you present for a specific section of this Web site under your name; or

(c) unless we are obliged legally to do so

**Global Provision**

The data published by PRIME MINISTRY PROPERTY INFORMATION OFFICE OF THE TURKISH REPUBLIC OF NORTHERN CYPRUS through the World Wide Web may contain references or cross references or information not publicised in your country. Such references do not imply that PRIME MINISTRY PROPERTY INFORMATION OFFICE OF THE TURKISH REPUBLIC OF NORTHERN CYPRUS intends to publicise them in your country.

**Relations**

PRIME MINISTRY PROPERTY INFORMATION OFFICE OF THE TURKISH REPUBLIC OF NORTHERN CYPRUS does not make any representations about other Web sites you access through this Web site. When you access a Web site which does not belong to PRIME MINISTRY PROPERTY INFORMATION OFFICE OF THE TURKISH REPUBLIC OF NORTHERN CYPRUS, even if that Web site contains the logo of PRIME MINISTRY PROPERTY INFORMATION OFFICE OF THE TURKISH REPUBLIC OF NORTHERN CYPRUS, please note that that Web site is independent from PRIME MINISTRY PROPERTY INFORMATION OFFICE OF THE TURKISH REPUBLIC OF NORTHERN CYPRUS and PRIME MINISTRY PROPERTY INFORMATION OFFICE OF THE TURKISH REPUBLIC OF NORTHERN CYPRUS does not have any control over the content of that web site. Furthermore, a link to a Web site which does not belong to PRIME MINISTRY PROPERTY INFORMATION OFFICE OF THE TURKISH REPUBLIC OF NORTHERN CYPRUS does not signify that PRIME MINISTRY PROPERTY INFORMATION OFFICE OF THE TURKISH REPUBLIC OF NORTHERN CYPRUS is responsible for the content of that Web site or that PRIME MINISTRY PROPERTY INFORMATION OFFICE OF THE TURKISH REPUBLIC OF NORTHERN CYPRUS approves or accepts the usage of such web sites. In every Web site you choose to access, you are responsible for taking precautions against viruses, trojan horse, worms and other hazardous elements.

**TRNC PRIME MINISTRY** | Terms and Conditions | Privacy Policy | Site Map

Case 1:09-cv-01967-PLF   Document 17   Filed 04/01/10   Page 121 of 122

Turkish Republic of Northern Cyprus Prime Ministry Property Information Office
Official Website © 2008  All Rights Reserved
More Info:
Last Digital
Content Automation Software

Technology By [x] Last Digital

**UNITED STATES DISTRICT COURT FOR**
**THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| Toumazou, | ) | |
| et al., | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No. 09-1967 |
| | ) | Judge Paul L. Freidman |
| v. | ) | |
| | ) | |
| | ) | |
| | ) | |
| Turkish Republic of Northern Cyprus | ) | |
| et al. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| _____ | ) | |

## <u>ORDER</u>

This matter having come before the Court on the TRNC's Motion to Dismiss for lack of personal jurisdiction and improper venue and to dismiss the claims of Michali Toumazou pursuant to Local Rule 5.1(e), and the Court having been duly advised,

IT IS HEREBY ORDERED AND ADJUDGED that the Motion is hereby GRANTED.

The Complaint is hereby dismissed for lack of personal jurisdiction and improper venue or in the alternative the claims of Michali Toumazou are dismissed pursuant to Local Rule 5.1(e) with prejudice.

IT IS SO ORDERED on this the _____ day of _____, 2010.


_____
United States District Court Judge